In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-4765

MICHAEL PATTON

*Plaintiff-Appellant,*

*v.*

MFS/SUN LIFE FINANCIAL DISTRIBUTORS, INC.

*Defendant-Appellee.*

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 04-CV-1335—**Larry J. McKinney**, *Chief Judge.*

ARGUED SEPTEMBER 21, 2006—DECIDED MARCH 12, 2007

Before BAUER, CUDAHY, and WOOD, *Circuit Judges.*

CUDAHY, *Circuit Judge.* When Michael Patton seriously injured his knee, his doctors concluded that he was no longer able to perform his job as a truck driver for Pac-Van, Inc. Patton presented a claim for long-term disability benefits to the administrator of Pac-Van's employee benefits plan, MFS/Sun Life Financial Distributors, Inc. Sun Life initially approved Patton's benefits, but discontinued them a year later. It found him able to perform his job in light of his training for an even more physically stressful career as a paramedic and a bizarre series of contradictory letters from his orthopedic specialist, first claiming that Patton was unable to work, then indicating

he was, then finally reversing course again and indicating that he was unable to work. Patton sued for the discontinued benefits under the Employee Retirement Income Security Act. The district court limited its review to Sun Life's administrative record and denied Patton's motion to permit discovery and the introduction of new evidence. Sun Life moved for summary judgment and the district court granted the motion. Patton now appeals the grant of summary judgment and the denial of his motion for discovery. We reverse.

## I. Background

On January 10, 2003, Michael Patton fell from a ladder while removing Christmas decorations at his house, injuring his left knee. He went to his doctor three days later and then, on January 22, made a fateful visit to a specialist who will feature large in this tale, orthopedic surgeon Dr. Thomas Ambrose. An MRI revealed softening of cartilage in the patella and Ambrose prescribed a physical therapy regimen that seemed to improve the knee somewhat. But Patton returned on March 12, complaining of "intermittent locking and sharp pain" in the knee. Ambrose decided to operate and performed a left knee arthroscopy, a partial lateral miniscectomy and an adhesive resection. In an April 9 follow-up examination, Ambrose prescribed a second regimen of rehabilitation.

Patton's injury interfered with his job as a truck driver for Pac-Van, Inc.; he stopped working on Monday, January 13, 2003. Pac-Van provided its employees with a long-term disability insurance plan administered by MFS/Sun Life Financial Distributors, Inc. (Sun Life), and funded by an insurance policy issued by Sun Life. Plan participants are entitled to Long-Term Disability benefits when they provide notice and proof that they are "Totally or Partially Disabled." (R. 24 at 16.) For twenty-four months after

an initial ninety-day "Elimination Period," an employee is "Totally Disabled" if injury or illness leaves him "unable to perform Material and Substantial Duties of his Own Occupation." (*Id.* at 13.) One's "Own Occupation" is one's "usual and customary employment . . . as it is generally recognized in the national economy" (*id.* at 12); its "Material and Substantial Duties" are the "essential tasks, functions, skills or responsibilities" it requires (*id.* at 11).

On April 25, 2003, Patton submitted a long-term disability claim statement to Sun Life, alleging that he was totally disabled, that is, unable to work as a truck driver. He attached a Sun Life Attending Physician's Statement form filled out by Dr. Ambrose. Ambrose indicated that Patton could work an eight hour day, but only with certain restrictions. For instance, he could walk for no more than six to ten hours a day, sit for no more than five to ten hours a day (for no more than one hour at a time) and lift no more than twenty-five pounds repeatedly and no more than 180 pounds occasionally. Apparently, he did not believe Patton could drive: a series of check boxes for indicating that Patton could drive one to three hours, three to five hours, and five to ten hours were left blank.[1] Overall, Ambrose found that Patton was capable only of "light work" as defined in the U.S. Department of Labor Dictionary of Occupational Titles. In the prognosis section, Ambrose checked a box indicating that Patton's limitations would apply "[p]ermanently." In the "vocational rehabilitation" section, Ambrose indicated that he had reviewed the duties of Patton's occupation "per patient's report" and recommended vocational counseling and

---

[1] Sun Life's form does not provide a separate check box to indicate that no driving is allowed, though it does provide one to indicate that no walking or standing is allowed. All other questions on the page have been answered.

rehabilitation to find a way to "Decrease stress on his Left knee." (*Id.* at 283-86.)

Patton also included a letter from Ambrose and a fellow practitioner. This letter stated in part:

> [Patton] continues to have pain and difficulty with his L knee and for this reason we have recommended activity restrictions in order to decrease the stress on his knee. His current restrictions include no repetitive lifting over 25 pounds, no repetitive climbing or squatting, and no sitting with knees flexed for over one hour at a time.
>
> The natural progression of osteoarthritis is to slowly worsen over time. We hope to prolong the use of his L knee so he does not require total joint arthroplasty for quite some time as joint replacement does not last long in the younger, more active person. Unfortunately, his current job requires him to do many stressful activities including driving with his knees flexed, and also requires him to perform repetitive lifting, climbing, and squatting activities. He is currently in need of vocational rehab training in order to be in a career that would not be so stressful on his knee joint. (*Id.* at 293.)

On May 7, 2003, while Sun Life was evaluating Patton's claim, Ambrose discontinued treating Patton:

> Michael is seen back today for follow up of his left knee. He continues to work on physical therapy and rehabilitation and reports improving strength as well as motion about the knee. . . .
>
> Michael is going to continue his therapy and rehabilitation on his own. He has resumed school and is going back to study paramedic training. I am going to release him from further routine follow up although I will be happy to see him back on an as necessary basis. (*Id.* at 211.)

Sun Life appears to have received this memo in a medical record request on June 17, 2003.

Sun Life approved Patton's claim on July 21, 2003, but a month later noticed something puzzling: his paramedic training. Patton's claim form indicated that he was a "former fire department volunteer with some first responder training," and that he had considered retraining as a paramedic. Patton visited vocational rehabilitation specialist Michael Blankenship, who reported that Patton wanted to become a "registered nurse or paramedic" and was enrolled at Ivy Tech State College, taking courses in English, mathematics and interpersonal communications.

But providing emergency medical service is generally at least as physically stressful as driving a truck. The Department of Transportation's Occupational Description for "EMT-Paramedic" indicates "[v]ery [h]eavy" strength requirements. Paramedics must be able to stoop and kneel frequently, lift fifty pounds regularly and twenty pounds "constantly." Some requirements exceed Ambrose's restrictions. As a result, paramedic training seems a strange course of action for one restricted as Patton claims to be. Unless his condition improved—and Ambrose suggested that it would not—Patton could never put his training to use.

Sun Life questioned Dr. Ambrose about this peculiarity. On August 26, 2003, it faxed him the message, "Mr. Patton indicated that you provided him with a release so that he can start paramedic's training next week. Please provide a copy of the release with any restrictions." (*Id.* at 166.) Ambrose responded by sending another copy of the April 25 material that Patton had included with his claim. On September 30, 2003, Sun Life sent Ambrose a copy of the DOT Occupational Description for "EMT-Paramedic," Patton's job description and a letter, the second

page of which is a specially-composed form above a signature block:

> On August 26, 2003, we requested that you provide us with a copy of Mr. Patton's release with his updated restrictions. We received the copy of the April 24, 2003 notes instead.
>
> Please provide us with a copy of the recent release allowing Mr. Patton to start his Paramedic training. Please include with that release a copy of his current restrictions.
>
> By sending a copy of the April 24, 2003 notes, was your intent to indicate that the restriction contained in the note were Mr. Patton's current restrictions?
> Please check one                    Yes _____    No _____
>
> Please advise if Mr. Patton's restrictions have been revised since April 24, 2003. If so, what are the new restrictions?
>
> If you have released Mr. Patton to pursue a career in Paramedics, would this be reasonable given the described restrictions in your April 24, 2003 notes. (*Id.* at 160.)

Ambrose didn't respond to the letter or a reminder sent December 3, 2003. Neither did he immediately respond to a second copy of the letter sent February 9, 2004. Finally, on March 9, 2004, Ambrose faxed to Sun Life a copy of the form he had received on September 30 and February 9, which he had signed. He had checked the "no" box to say that he had not intended to indicate that the April 25, 2003 restrictions were current, and wrote under the question "Please advise if Mr. Patton's restrictions have been revised . . ." the phrase "released without restrictions 05/07/03." The form was otherwise unmarked.

Armed with this letter, Sun Life cut off Patton's benefits on April 28, 2004, explaining to Patton that it had

discovered that paramedic work was as demanding as truck driving and that Ambrose had revealed that Patton had not been disabled since May 7, 2003. On May 26, 2004, Patton filed an administrative appeal and presented *another* letter from Dr. Ambrose, this one dated May 12, 2004 and stating:

> Mr. Michael Patton is a patient with known severe premature arthritis of the left knee. He is unable to utilize the knee to depress and release a mechanical clutch of a tractor trailer rig. This is a permanent restriction, and as a result, he is disabled from his previous occupation as an overland truck driver. I am recommending vocational rehabilitation for job re-training. (*Id.* at 117.)

Patton did not submit any other evidence. Sun Life referred the case to an orthopedic specialist, Dr. Robert Foster. Foster opined that "many people with medial facit arthritis can drive a truck doing deliveries and only the test of time would be able to determine its suitability . . . to the degree and duration." Sun Life reviewed Patton's file and affirmed its prior decision on July 29, 2004. Patton then brought the present action under the Employee Retirement Income Security Act § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) (ERISA), to "recover benefits due to him under the terms of his plan." Specifically, Patton seeks benefits for the twelve month period after his benefits were cut off, during which he was "Totally Disabled" within the meaning of the plan if he was unable to perform the material and substantial duties of a truck driver.

In the district court, the parties disputed the appropriate standard of review of Sun Life's benefits determination. Sun Life filed a motion for summary judgment on August 19, 2005, in which it argued that its determination should only be overturned if it was arbitrary and capricious, because the plan stated that "proof [of any

disability claim] must be satisfactory to Sun Life," citing *Donato v. Metropolitan Life Insurance Co.*, 19 F.3d 375, 377 (7th Cir. 1994). Matters were complicated on September 20, 2005, when this Court decided *Diaz v. Prudential Insurance Co. of America*, 424 F.3d 635 (7th Cir. 2005). In *Diaz,* we held that to be subject only to deferential "arbitrary and capricious" review, a plan must sufficiently warn its participants that it grants the plan administrator "the power to interpret the rules, to implement the rules, and even to change them entirely." *Id.* at 639. We stated that "[n]o single phrase such as 'satisfactory to us' is likely to convey enough information" to put plan members on notice, and added that "[t]o the extent that the test applied in *Donato* . . . is inconsistent with the approach we are now articulating, we hereby disapprove" of that case. *Id.* at 639-40.

Patton soon argued not only that *Diaz* had changed the standard of review, but that the change required further changes to the court's case management order. On September 30, 2005, Patton filed a memorandum of law opposing Sun Life's motion for summary judgment in which he argued that under *Diaz*, Sun Life's decision was entitled not to deferential "arbitrary and capricious" review, but rather ordinary *de novo* review. He also filed a summary judgment motion of his own and presented an affidavit claiming that his paramedic training to date had not been physically stressful. Sun Life moved to strike the motion for summary judgment and affidavit as in violation of the court's case management order. The court's case management order required dispositive motions to be filed by August 19, 2005, and closed discovery for the plaintiff on September 19, 2005 (by agreement, neither party had engaged in any discovery). Patton argued in response that the change in the standard of review brought about by *Diaz* opened up avenues for appropriate discovery where none had existed before: while a court exercis-

ing "arbitrary and capricious" review must review only the documents presented to the plan administrator, a court exercising *de novo* review may, in its discretion, hear new evidence. Patton asked the court to alter the case management order to reopen discovery and permit the late filing of his summary judgment motion.

The district court denied Patton's motion to reopen discovery and granted Sun Life's motion to strike Patton's affidavit and his motion for summary judgment. On November 28, 2005, the district court granted Sun Life's motion for summary judgment. It found that *de novo* review applied, but that even under this non-deferential standard the evidence before it did not present a genuine issue of material fact, so that Sun Life was entitled to judgment as a matter of law. Patton now appeals both the grant of summary judgment and the denial of his motion to reopen discovery.

## II. Discussion

The two decisions that Patton appeals stand in a somewhat unusual relationship to one another, in that the district court's denial of Patton's motion to reopen discovery may make it pointless to correct any error in the grant of summary judgment. Normally, of course, we must remand for trial when we determine that summary judgment is inappropriate, but we have not always followed this general rule in ERISA cases, where the plaintiff has no right to a jury trial and unusually limited abilities to introduce evidence. *See Mathews v. Sears Pension Plan*, 144 F.3d 461, 468 (7th Cir. 1998). The standard for summary judgment is more demanding than the standard for judgment after a bench trial. If on a certain record a district court believes a party is entitled to summary judgment, then the same court, if required to conduct a bench trial on that same record, will probably

decide the case for that same party. Consequently, if we think that a district court granted summary judgment despite the existence of genuine issues of material fact, but know that no new evidence will be presented at trial on remand, we can in most (though not necessarily all)[2] situations know with certainty that remand would be an unwarranted "empty formality."[3] *Mathews*, 144 F.3d at

---

[2] In some situations, the winner of a bench trial might be uncertain even though no new evidence will be presented. For instance, an appellate opinion might illumine some aspect of the record that the district court improperly ignored, in which case the remand would be analogous to remanding agency action for further consideration or explanation. *See, e.g.*, *Banks v. Gonzales*, 453 F.3d 449, 451 (7th Cir. 2006), *citing SEC v. Chenery Corp.*, 318 U.S. 80, 88-89 (1943); *but see Mengistu v. Ashcroft*, 355 F.3d 1044, 1047 (7th Cir. 2004), *citing Sahara Coal Co. v. Office of Workers' Comp. Programs*, 946 F.2d 554, 558 (7th Cir. 1991) (applying the harmless error doctrine to review of administrative action as an exception to the *Chenery* principle).

[3] The First Circuit has taken a more far-reaching approach to appeals of summary judgments in ERISA cases, treating summary judgment as summary in name only. "[I]n an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. . . . [T]he non-moving party is not entitled to the usual inferences in its favor." *Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005), *cert. denied*, 74 U.S.L.W. 3018 (U.S. Oct. 11, 2005), *cited in Bard v. Boston Shipping Ass'n.*, 471 F.3d 229, 235 (1st Cir. 2006). We do not apply this potentially misleading standard for "summary judgment," but instead apply the normal rule: *de novo* review, with judgment appropriate if there is no genuine issue of material fact. Fed. R. Civ. P. 56(c), *Semien v. Life Ins. Co. of N. Am.,* 436 F.3d 805, 812 (7th Cir. 2006), *cert. denied*, 74
(continued...)

468; *see also* Fed. R. Civ. P. 61; *Simpson v. Nickel*, 450 F.3d 303, 306 (7th Cir. 2006) (holding that if nothing the plaintiff could show would avoid summary judgment, "then dismissing the complaint instead of waiting for a Rule 56 motion was harmless error"); *Alioto v. Marshall Field's & Co.*, 77 F.3d 934, 936 (7th Cir. 1996) (same).

The present case does not present such a situation, however. Patton has appealed both the district court's grant of summary judgment and its denial of his motion to reopen discovery. Because we reverse *both* of these decisions, there *will* be evidence introduced into the record besides that which was before the district court at summary judgment, and we therefore cannot say with certainty how the district court will resolve the case on remand.

A.  Motion for Summary Judgment

We begin with the court's grant of Sun Life's motion for summary judgment, which we review *de novo. Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812 (7th Cir. 2006), *cert. denied*, 74 U.S.L.W. 3629 (U.S. Oct. 2, 2006). Summary judgment is appropriate only if the evidence presents no issue of material fact, so the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

---

[3] (...continued)
U.S.L.W. 3629 (U.S. Oct. 2, 2006); *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004); *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994) ("[T]he district court improperly weighed evidence in this case in arriving at its decision to grant summary judgment. . . . [T]he appropriate proceedings for such fact-finding is a bench trial and not the disposition of a summary judgment motion.") Those who wish to ensure that a judgment is treated with the deference due the result of a bench trial are advised to eschew Rule 56 and stick to Rule 52(a).

56(c); *Semien*, 436 F.3d at 812. The moving party is so entitled if no reasonable fact-finder could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986); *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1139 (7th Cir. 1997). Whether a reasonable factfinder could return a verdict for the nonmoving party is determined in part by the substantive burden of proof that that party faces. *Anderson,* 477 U.S. at 252; *Patel v. Allstate Ins. Co.*, 105 F.3d 365, 370 (7th Cir. 1997).

Sun Life first argues that we should affirm summary judgment for a reason not relied upon by the district court: an allegedly heightened burden of proof upon Patton. The court held that Patton merely had to show that he was "totally disabled" within the meaning of the plan during the relevant period to prevail (so-called "de novo review" of Sun Life's benefits determination). Sun Life urges that the plan granted the administrator broad discretion to determine entitlement to benefits, and consequently that Patton had to instead show that Sun Life's determination was arbitrary and capricious (so-called "arbitrary and capricious review").

Which burden of proof applies is determined by the ERISA plan itself, as interpreted under federal common law. *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005); *Kammler v. H/N Telecomm. Servs., Inc.*, 305 F.3d 672, 680 (7th Cir. 2002). ERISA contract law is shaped by ERISA's goal of providing uniform remedies to employees. *See* ERISA §§ 101(b) & 502(a)(1)(B), 29 U.S.C. §§ 1001(b) & 1132(a)(1)(B); *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004); *Firestone Tire & Rubber Co. v. Burch*, 489 U.S. 101, 113 (1989); *see also Sullivan v. Cox*, 78 F.3d 322, 326 (7th Cir. 1996) (holding that ERISA common law of contract interpretation is shaped by substantive ERISA goals). Absent clear language to the contrary, plans are read to provide for searching judicial

review of benefits determinations: plenary review of the administrator's interpretation of the facts and plan, *Firestone Tire*, 489 U.S. at 110-15; *Sperandeo v. Lorillard Tobacco Co.*, 460 F.3d 866, 870 (7th Cir. 2006); *Ruttenberg*, 413 F.3d at 659, fortified by the district court's discretionary authority to hear evidence that was not presented in the administrative process, *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994), *citing Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993).[4] The employee thus presumptively has a right to an "informed and independent judgment" on his claim for benefits—informed by evidence as the court thinks necessary, and fully independent of the plan administrator's findings and reasoning. *Id.*

As noted, this presumption can be overcome with clear language to the contrary; an ERISA plan can provide for more restrictive judicial review of benefits determinations by including language that "gives the administrator or fiduciary discretionary authority to determine eligibility for benefits." *Diaz v. Prudential Ins. Co. of Am.*, 424 F.3d 635, 636-37 (7th Cir. 2005), *citing Firestone Tire*, 489 U.S. at 115. The language must possess "requisite if minimum clarity," *Diaz*, 424 F.3d at 637-38, *citing Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000); *see also Ruttenberg*, 413 F.3d at 659; indicating that the administrator "not only has broad-ranging authority to assess compliance with pre-existing criteria, but also has

---

[4] We have also suggested that this rule would apply "as a matter of ordinary contract law, with no ERISA thumb on the scales." *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 330 (7th Cir. 2000), citing John H. Langbein*, The Supreme Court Flunks Trusts*, 1990 Supreme Ct. Rev. 207, 223-26; *see also Sullivan*, 78 F.3d at 326 ("In cases arising under section 1145, federal courts have consistently applied state contract law, so long as the state law is not contrary to ERISA.").

the power to interpret the rules, to implement the rules, and even to change them entirely." *Diaz*, 424 F.3d at 639.[5]

Sun Life claims that its plan limits judicial review by stating that proof of disability "must be satisfactory to Sun Life." (R. 24 at 33.) But plan terms requiring only that proof "satisfactory to us" be submitted for benefits are not sufficiently clear to limit review. *Every* plan will require employees to prove they are entitled to benefits before receiving them, and provisions that merely implement that basic requirement do not warn employees of broad administrative discretion and limited review. *Diaz*, 424 F.3d at 637, *citing Herzberger*, 204 F.3d at 332; *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir. 1999). Sun Life cites two cases that it claims are to the contrary. *See Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 379-80 (7th Cir. 1994); *Bali v. Blue Cross & Blue Shield Ass'n*, 873 F.2d 1043, 1047 (7th Cir. 1989). They are unquestionably to the contrary: we have expressly overturned them. *See Diaz*, 424 F.3d at 640. The district court was correct to apply a non-deferential, *de novo* standard of review to Sun Life's denial of Patton's benefits claim.

We must therefore determine whether the district court's independent review of the record was correct. Summary judgment is appropriate only if no reasonable factfinder could conclude that Patton was unable to drive a truck from April 28, 2004 to April 28, 2005. Sun Life argues

---

[5] We have set forth a model clause that serves as a "safe harbor" for ERISA plans and plan members seeking to limit judicial review: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Herzberger*, 205 F.3d at 331. Other language can be used, so long as it satisfies the minimum standard of clarity. *Sperandeo*, 460 F.3d at 872; *Herzberger*, 205 F.3d at 332.

that two inconsistencies in Patton's evidence prevent reasonable disagreement about his claims. First, it notes that Dr. Ambrose contradicted his initial April 25, 2003 and most recent May 12, 2004 diagnoses that Patton is unable to drive a truck in his intervening March 9, 2004 response to Sun Life's letter, in which he stated that Patton faced no restrictions. Second, it notes that Patton is studying a profession that, according to Dr. Ambrose's April 25, 2003 diagnosis, he will be permanently unable to perform.

Sun Life begins its attack from Ambrose's contradictory letters by arguing that no reasonable factfinder could believe Ambrose's most recent letter of May 12, 2004. It describes the May 12, 2004 letter as a "one-paragraph conclusory statement, unsupported by *any* medical evidence, clinical data, or office notes," and correctly notes that medical (and all expert) opinions which fail to explain the basis for their conclusions cannot by themselves create a genuine issue of material fact. *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998); *Vollmert v. Wis. Dep't of Transp.*, 197 F.3d 293, 298 (7th Cir. 1999); *Weigel v. Target Stores*, 122 F.3d 461, 468-69 (7th Cir. 1997); *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chi.*, 877 F.2d 1333, 1339 (7th Cir. 1989) (collecting cases). Such naked assertions are indeed insufficient by themselves, but Ambrose's letter does not stand alone: the record also includes Ambrose's comparatively detailed April 25, 2003 diagnosis. This diagnosis sets forth Ambrose's opinion as to Patton's condition, his prognosis and the resulting limitations he faces. It was detailed enough for Sun Life, which initially approved benefits after receiving it, and it is detailed enough for the federal courts, since "even brief expert reports will suffice at the summary judgment stage." *Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005), *citing Vollmert*, 197 F.3d at 300-01 (holding that an expert report at summary judgment must

supply the basis for the opinion but need not "give a primer on why the facts allow the expert to reach [her] conclusion"). The May 12, 2004 letter and the April 25, 2003 diagnosis are not identical in all details—for instance, the 2004 letter states that Patton is unable to drive a truck because of the stress of working the clutch; the 2003 diagnosis instead mentions stooping, lifting and sitting with knees flexed—but they are generally consistent and together present a coherent opinion that Patton's knee leaves him unable to drive a truck.

Recognizing that the April 25, 2003 diagnosis is poison to its summary judgment hopes, Sun Life argues that the March 9, 2004 letter—the partially filled-out form in which Ambrose stated that he released Patton without restrictions on May 7, 2003—takes the 2003 diagnosis out of the equation. Sun Life stresses that the March 9 letter is "unqualified" and "informed," and both qualities are indeed indisputable; the letter included no qualification and was written after Sun Life sent Ambrose the Department of Transportation fact sheets.

Nonetheless, a reasonable factfinder would be interested in other qualities as well, for instance, whether the letter was considered, detailed or carefully composed. It is ironic that Sun Life attacks Ambrose's May 12, 2004 letter as terse and conclusory when the March 9, 2004 letter it claims decides the case is still less detailed. Ambrose's markings on Sun Life's form are limited to a few words stating that Patton was released without restrictions on May 7, 2003, and a checkmark indicating that his re-mailing the April 25, 2003 diagnosis was not meant to indicate that the diagnosis was still accurate. If it were not that the letter undermines Ambrose's credibility, it would lack sufficient basis to be have weight as an independent medical opinion. The letter disavows the April 25 diagnosis, but does not explain why Ambrose changed his opinion, in fact why he apparently changed his opinion on May

7, 2003, only twelve days after he reported his original diagnosis to Sun Life. Neither is there any explanation why Ambrose, apparently having already rejected his April 25 diagnosis, sent another copy of that diagnosis to Sun Life in August or September 2003.

Patton suggests, in light of these mysteries, that Ambrose's March 9 letter was a mistake: somehow, Ambrose misunderstood Sun Life's letter and stated that Patton faced no restrictions when he actually did. Sun Life urges that there is no evidence that the letter was a mistake, but that is not quite true. There is no *extrinsic* evidence of mistake; no one has testified as to why the letter was sent if it was not true. But that is not fatal to Patton's claim in light of the *intrinsic* evidence suggesting mistake—the detailed April 25 diagnosis, the subsequent May 12, 2004 letter reaffirming that diagnosis, the lack of detail in the March 9, 2004 letter and the unexplained contradictions between the various communications. Some of Ambrose's messages to Sun Life contain either errors or lies, but reasonable factfinders could locate them in different places.

Sun Life cites the rule of thumb that a party cannot defeat summary judgment by having a witness contradict her own prior deposition testimony. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 759 (7th Cir. 2006); *Adelman-Tremblay v. Jewel Co.*, 859 F.2d 517, 520-21 (7th Cir. 1988). When a witness abandons her testimony in the face of a pending summary judgment motion, the change is often a transparent ruse designed to prolong the case; allowing the ruse to succeed would defeat summary judgment's purpose of weeding out clearly unmeritorious cases. *Bank of Ill. v. Allied Signal Saftey Restraint Sys.*, 75 F.3d 1162, 1168-69 (7th Cir. 1996); *see also, e.g.*, *Weigel*, 122 F.3d at 463; *Adelman-Tremblay,* 859 F.2d at 518. But while a change in testimony is often a clear ruse, it is sometimes plausible. A number of scenarios might ex-

plain a change: a confusing deposition question, circumstances indicating a lapse of memory, *Pourghoraishi*, 449 F.3d at 759, relevant new information discovered after the original testimony, *Adelman-Tremblay*, 859 F.2d at 520-21, or ambiguous or incomplete earlier testimony, *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 602-03 (7th Cir. 1999); *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1007 (7th Cir. 1999); *Bank of Ill.,* 75 F.3d at 1171; *Adelman-Tremblay*, 859 F.2d at 520. Consequently a court must examine the particular circumstances of a change in testimony to see whether it is plainly incredible or merely creates a credibility issue for the jury. *Bank of Ill.*, 75 F.3d at 1169-70.[6]

Patton points out that Ambrose's diagnoses and letters were not made under oath, *see Bank of Ill.*, 75 F.3d at 1169; *Darnell v. Target Stores*, 16 F.3d 174, 176 (7th Cir. 1994), but there is a more basic problem with Sun Life's argument: Ambrose's representations prior to his May 12, 2004 statement that Patton was unable to drive a truck were inconsistent and ambiguous, and the May 12, 2004 letter could plausibly be considered a truthful effort to resolve that ambiguity. In cases where we have rejected a

---

[6] We have also suggested, in dicta, that a witness who changes her testimony must explain the reason for her change in the new testimony itself or the new testimony may not be considered; even if one could infer a reason for the change in testimony, one may not do so unless the witness herself offers that reason in her new testimony. *Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623-24 (7th Cir. 2002). The justification for that rule is not clear. It would be helpful for a witness to explain any inconsistencies—indeed, in the present case, the reason for Dr. Ambrose's inconsistent statements is one of the key issues—but it is unclear what basis there is for ignoring a reason for a change in testimony that is apparent from other evidence in the record.

change in testimony, the witness has consistently ad-hered to one version of events prior to the change. Take, for instance, *Adelman-Tremblay*, where the court found a doctor's testimony that the plaintiff suffered an allergic reaction "a model of clarity." 859 F.2d at 520. It is obvious why in such a situation no one could credit the doctor's sudden, case-saving realization that the plaintiff's reac-tion might have been toxic instead.

In the present case, by contrast, Ambrose's position prior to May 12, 2004 was inexplicably inconsistent, a model of confusion. Any jury faced with both the April 25, 2003 diagnosis (Patton is unable to drive) and the March 9, 2004 letter (Patton is able to drive) would have to conclude either that one of the diagnoses was wrong or that some unknown factor explained the contradiction. The May 12, 2004 letter purports to clarify which of the two earlier positions is correct (the April 25, 2003 diagnosis that Patton is unable to drive). The jury could go either way in the absence of the clarification; why should it be unable to believe the clarification? Ambrose's letter would be more powerful if it explained why he had previ-ously taken inconsistent positions—an omission perhaps not the fault of Patton or his lawyer, given that as far as we know during the ERISA administrative proceeding, Patton lacked the ability to compel Ambrose's testimony or cross-examine him. *Cf. Beckel v. Wal-Mart Assocs., Inc.*, 301 F.3d 621, 623 (7th Cir. 2002). Ambrose may not have been eager to explain in detail why his office sent out false information about a patient to an insurance company. But even with the letter of May 12, 2004 as it is, a reasonable factfinder could conclude that Ambrose's March 9, 2004 letter was a mistake and that the April 25 diagnosis and May 12, 2004 letter represent Ambrose's true opinion and are correct.

This leaves Sun Life's second and more serious argu-ment: that Patton is training to perform paramedic work,

which is at least as stressful as driving a truck. This is an important problem for Patton's claim, but on the current record the contradiction is not as glaringly clear as Sun Life makes out. It urges that Dr. Ambrose's release of Patton from further treatment on May 7, 2003 was "based on the job requirements of an EMT and Plaintiff's ability to do the EMT job." (Br. of Appellee 24.) But Ambrose's notes do not indicate that Ambrose at that time knew the job requirements of an EMT or believed that Patton could perform them. Ambrose is an orthopedic surgeon, not a rehabilitation specialist. He evaluated whether Patton was able to perform his own job as Patton described it in the April 25 diagnosis, filling out the requested information on Sun Life's form, but he may not have thought it was his business to go beyond that and evaluate Patton's proposed career. The sole mention of paramedic work in Ambrose's notes is the brief remark, "He has resumed school and is going back to study paramedic training." While a reasonable factfinder could conclude that Ambrose thought Patton's knee could handle the stress of paramedic work, that inference is not compelled.

Neither this evidence about Patton's EMT aspirations nor any other evidence in the record, such as Dr. Foster's very limited opinion that, basically, he was unsure whether Patton was able to drive a truck, takes the case out of the range of reasonable disagreement. The contradictions in Dr. Ambrose's letters and the possible contradiction in Patton's studies are key issues that could convince a reasonable factfinder that Patton's disability is a sham and that he is not entitled to benefits. But they do not *compel* a reasonable factfinder to so conclude. There remain genuine issues of material fact that render the district court's grant of summary judgment inappropriate.

B.  Motion to Reopen Discovery

Though the district court should not have decided the case on summary judgment, the question remains whether, pursuant to Patton's motion, it should have reopened discovery to permit Patton to, for instance, depose Dr. Ambrose. Sun Life urges affirmance, arguing that Patton had the opportunity during his administrative appeal to introduce the equivalent of the evidence he hopes to introduce on remand. Patton rejoins that the evidence he wants to present is necessary for the court to conduct an informed evaluation of his claims.

As already noted, Sun Life's plan does not limit its participants' rights to informed, independent review of benefit determinations by the courts, so the district court had discretion to "limit the evidence to the record before the plan administrator, or . . . [to] permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment." *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 (7th Cir. 1994), *citing Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1025 (4th Cir. 1993).[7] We review the denial of Patton's motion

---

[7]  Other courts have taken different approaches to the admission of evidence outside the administrative record. *See, e.g.*, *S. Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d 98, 101-02 (5th Cir. 1993) (holding that additional evidence may be taken as to the meaning of plan terms, but not as to other questions); *Perry v. Simplicity Engineering*, 900 F.2d 963, 967 (6th Cir. 1990) (holding that review must be limited to the administrative record); *Moon v. Am. Home Assurance Co.*, 888 F.2d 86, 89 (11th Cir. 1989) (holding that additional evidence should always be admitted). However, the Second, Third, Fourth, Seventh, Eighth, Ninth and Tenth Circuits agree that the district court should have discretion to admit or not to admit new evidence. *See Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002); *DeFelice v. Am. Int'l Life Assurance Co. of N.Y.*, 112 F.3d 61, 66-

(continued...)

for abuse of that discretion, *Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 813 (7th Cir. 2006); *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 631 (7th Cir. 2004), which is appropriate where the district court's decision cannot be rationally based upon the record evidence, or is based on an erroneous legal conclusion, or is supported by clearly erroneous factual findings or clearly appears arbitrary, *Vallone*, 375 F.3d at 631. The district court must sufficiently explain its decision to show us that it considered the relevant factors and exercised its discretion. *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005).

Numerous factors are relevant to the district court's decision, the most central being the court's need to hear the evidence in order to make an informed evaluation of the parties' claims and defenses. In *Casey v. Uddeholm Corp.*, 32 F.3d 1094 (7th Cir. 1994), the plaintiff sued to recover benefits from the Uddeholm Health Benefits Plan for injuries he sustained in an attempt to commit suicide; the key question was whether the injuries were "sustained accidentally." *Id.* at 1095-96. The plan

---

[7] (...continued)
67 (2d Cir. 1997); *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943-44 (9th Cir. 1995); *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1184-85 (3d Cir. 1991). Of course, when a plan grants broad discretion to a plan administrator to interpret the plan and make benefit determinations, rendering its determinations subject only to deferential "arbitrary and capricious" review, discovery is generally not permitted, *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 629 (7th Cir. 2004), *citing Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999), though discovery is sometimes allowed into certain limited subjects, *see generally Semien v. Life Ins. Co. of N. Am.*, 436 F.3d 805, 812-16 (7th Cir. 2006).

administrator determined that injuries from a suicide attempt could never be accidental, but the district court disagreed, holding that the injuries could have been accidental if Casey had been insane at the time of the attempt. *Id.* at 1096-97. The district court then granted summary judgment to Uddeholm on the ground that Casey had not been insane. *Id.* at 1099. On appeal this court reversed, holding that there were genuine issues of material fact forestalling summary judgment, and then addressed whether the district court should be able to hear additional evidence on remand:

> In *Quisenberry v. Life Ins. Co. of North America*, 987 F.2d 1017, 1025 (4th Cir. 1993) the Sixth Circuit [sic] held that a district court may review evidence beyond that which was before the plan administrator only when circumstances clearly establish that additional evidence is necessary, but that as a general matter the district court should restrict itself to the evidence before the plan administrator. In this case the record before the plan administrator was relatively undeveloped. Therefore, in its *de novo* review the district court may limit the evidence to the record before the plan administrator, or it may permit the introduction of additional evidence necessary to enable it to make an informed and independent judgment.

32 F.3d at 1099. The most important factor for the district court, therefore, seems to be whether the evidence is "necessary" to an "informed and independent judgment" on the parties' claims and defenses, which will obviously depend on the nature of the claims and whether the administrative record was "relatively undeveloped" with respect to those claims. Most other courts that share our discretionary approach to new evidence agree. *Hall v. Unum Life Ins. Co. of Am.*, 300 F.3d 1197, 1202 (10th Cir. 2002) (holding that the record should be expanded "when circumstances clearly establish that additional evidence

is necessary to conduct an adequate *de novo* review of the benefit decision"); *Donatelli v. Home Ins. Co.*, 992 F.2d 763, 765 (8th Cir. 1993) (same); *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176, 1185 (3d Cir. 1991) ("If the record on review is sufficiently developed, the district court may, in its discretion, merely conduct a *de novo* review of the record of the administrator's decision.").

Other factors are also relevant. Courts have suggested, for instance, that the district court may wish to consider whether the evidence the parties seek to introduce would concern plan terms or historical facts concerning the claimant, whether the plan administrator faced a conflict of interest and, as Sun Life notes, whether the parties had a chance to present their evidence in the ERISA administrative proceeding. *Quesinberry*, 987 F.2d at 1027. But no factor is necessarily determinative in any particular case. The district court must take the relevant factors into consideration and provide a reasonable explanation for its decision; so long as it does so, its decision will be affirmed. Reversals will be rare.

The present case, however, is one of the rare ones. To begin with, the district court failed to adequately explain its decision. In making a discretionary decision, a court must present an explanation for its choice sufficient to enable a reviewing court to determine that it did not act thoughtlessly, but instead considered the factors relevant to its decision and in fact exercised its discretion. *Rivera v. City of Chicago*, 469 F.3d 631, 635-36 (7th Cir. 2006); *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005); *Vergara-Molina v. INS*, 956 F.2d 682, 685 (7th Cir. 1992). The court need not mechanically list factors or address all the parties' arguments, but a sufficiently strong argument merits discussion and a reviewing court cannot conclude that discretion was exercised

when a strong argument is "passed over in silence." *Cunningham*, 429 F.3d at 679.

That is precisely what happened here. Patton's argument for reopening discovery was compelling. It was late by the terms of the case management order, so Patton needed an excuse for his tardiness. *See, e.g.*, *Rosetto v. Pabst Brewing Co.*, 217 F.3d 539, 542 (7th Cir. 2000). But he had one: prior to the *Diaz* decision, the parties had not realized that the district court might have authority to hear additional evidence. The case could clearly have benefitted from having the gaps in the record filled, particularly those concerning Dr. Ambrose and his various communications. Nonetheless, the district court denied Patton's motion to reopen discovery without explanation. Additionally, and distressingly, the court specifically indicated that it was not at that time deciding whether *de novo* review applied to Patton's claim, and consequently whether it *could* hear new evidence. We cannot conclude that the district court exercised its discretion when it silently ignored a strong case for expanding the record while explicitly reserving whether it even had discretion to exercise. This alone merits a remand for the court to properly exercise its discretion with respect to Patton's motion.

Because the issue is before us, however, we go further: assuming the district court did exercise its discretion in refusing to grant Patton's motion, that discretion was abused. Generally, it is very hard to say that the district court abused its discretion in deciding not to hear additional evidence in an ERISA case. A court should not automatically admit new evidence whenever it would help to reach an accurate decision. *Any* relevant, probative evidence increases the likelihood of an accurate decision, but always at the price of increased cost, both in the form of more money and additional time. *See Quesinberry*, 987 F.2d at 1023, *citing Perry v. Simplicity Engineering*,

900 F.3d 963, 966-67 (6th Cir. 1990). The record calls for additional evidence only where the benefits of increased accuracy exceed the costs, a balance familiar to the district court. *Cf.* Fed. R. Evid. 403; *White v. United States*, 148 F.3d 787, 791 (7th Cir. 1998); *United States v. Pulido*, 69 F.3d 192, 204 (7th Cir. 1995).

In the present case, however, it is clear that a relatively slight expenditure to depose Dr. Ambrose will result in a unusually high payoff in increased accuracy, because the case hinges in part on factual determinations which, given the obscure evidence in the administrative record, are little better than guesses. A good example of a similar case is *Luby v. Teamsters Health, Welfare & Pension Trust Funds*, 944 F.2d 1176 (3d Cir. 1991). The benefits determination in that case hung on whether the participant in a death benefit policy had recently signed a card changing his beneficiary. Surprisingly, the ERISA administrative record contained no evidence as to what the participant's signature looked like other than two cards in the file, each of which bore differently styled signatures. The plan administrator guessed—absent additional evidence, there was nothing else it could have done—that the second signature was correct and ordered payment to the beneficiary named on the most recently filed card. *Id.* at 1179. But in a suit brought by the other purported beneficiary, the district court admitted into evidence other samples of the participant's signature that closely resembled the *first* signature, and concluded that the plan administrator had been wrong. The appellate court affirmed the decision to take new evidence because the evidence was needed to provide adequate information; without it, "[t]here was simply no evidentiary record for the district court to review." *Id.* at 1185.

The record in the present case is similarly configured. Sun Life chose to credit those of Ambrose's contradictory messages most favorable to it. None of the messages

purported to explain the others, and no party has offered any extrinsic evidence to explain the contradictions. On this record, a conclusion as to what Ambrose is even *thinking* is little better than a guess. But unlike in *Luby*, the district court did not make use of its discretionary power to hear additional evidence.

Sun Life argues that some factors called for excluding new evidence (most notably Patton's opportunity to have Dr. Ambrose to explain himself at greater length in the ERISA administrative appeal, assuming that Ambrose were willing to do so), but those concerns cannot outweigh the central one of the unusually glaring gap in the record which must be filled. The district court chose to make an arbitrary rather than an informed decision.

## III.  Conclusion

For the foregoing reasons we reverse the grant of Sun Life's motion for summary judgment and reverse the denial of Patton's motion to reopen discovery. On remand, the district court should at least hear additional evidence from Dr. Ambrose on the nature and basis of his diagnosis and the cause of his confusing series of communications to Sun Life. The court may also, in its discretion, permit or disallow the introduction of other additional evidence.

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*