In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2778

TROVARE CAPITAL GROUP, LLC,

*Plaintiff-Appellant,*

*v.*

SIMKINS INDUSTRIES, INCORPORATED, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 3133—**Robert W. Gettleman**, *Judge.*

ARGUED APRIL 12, 2011—DECIDED JULY 20, 2011

Before KANNE and EVANS, *Circuit Judges*, and CLEVERT, *District Judge.*[*]

KANNE, *Circuit Judge*.   Trovare Capital Group, LLC ("Trovare") was interested in buying the assets and real

---

[*] The Honorable Charles N. Clevert, Chief Judge of the United States District Court for the Eastern District of Wisconsin, sitting by designation.

properties of Simkins Industries, Inc., and its affiliates
Harvard Folding Box Co., Inc.; Linden-Summer Realty
Co., Inc.; and South Union Company, Inc. (collectively,
the "Defendants"). The parties executed a letter of intent
("LOI") in which they undertook to negotiate a sale
before a specified date. Negotiations faltered, and the
sale never took place. Trovare subsequently sued to
recover a "break-up fee" it claimed was owed it under
the LOI. The district court determined that no break-up
fee obligation had been triggered and granted summary
judgment in the Defendants' favor. Because genuine
issues of material fact persist as to whether actual negotia-
tions had terminated, we reverse the entry of summary
judgment and remand the case for further proceedings.

## I. BACKGROUND

An aborted business transaction underlies this diversity
case. In October 2006, Leon Simkins, controlling share-
holder for the family-owned enterprises comprising the
Defendants, decided to sell the Defendants' assets and
real properties. Simkins engaged Mesirow Financial, Inc.
("Mesirow") to act as the Defendants' broker. Trovare
became interested in purchasing the Defendants' proper-
ties, and—through its sole member, Randy Cecola—
it contacted Mesirow to begin negotiations.

Trovare and the Defendants executed their LOI on
May 23, 2007, setting forth the intentions of both parties to
negotiate toward Trovare's purchase of the Defendants'
assets and property. While the LOI was predominately
non-binding, it did obligate the parties to certain terms.

For example, the parties agreed in Paragraph 13 to a 90-day exclusivity period in which the Defendants would pursue a sale only with Trovare. Paragraph 14 provided that the Defendants would owe Trovare a $200,000 "break-up fee" if they either breached the exclusivity period or provided Trovare written notice of their unilateral termination of negotiations.[1] The LOI set a "Termination Date" of September 30, 2007, after which neither party would be obligated to further pursue the sale.

The parties agreed to use their best reasonable efforts to facilitate their negotiations and respective obligations. For example, Trovare needed to conduct due diligence investigations, validate the Defendants' relationships with key clients, and secure financing for the purchase. The Defendants eventually would have to provide access to their records, customers, and facilities to allow for the due diligence investigations. Both parties knew that environmental studies would be necessary and that, if an initial (Phase I) study recommended a more in-depth study, a more costly second (Phase II) study would be required before any sale of the properties. The LOI did not, however, assign either party responsibility for conducting Phase II studies or any required remediations; it left those matters to negotiation. Paragraph 9 recited some

---

[1] Paragraph 14 read in full: "If the Seller or any other shareholder of Seller breaches paragraph 13 of this letter or the Seller provides to Buyer written notice that negotiations toward a definitive asset purchase agreement are terminated, then Seller shall pay Buyer a breakup fee of two hundred thousand dollars ($200,000)."

conditions precedent to the completion of the transaction, including the completion of due diligence investigations to Trovare's satisfaction, the negotiation of an Asset Purchase Agreement ("APA"), and Trovare's receipt of financial commitments from lenders.

Shortly after the LOI was executed, Trovare completed the Phase I study and promptly informed Mesirow and the Defendants that Phase II testing would be necessary for all of the Defendants' properties. Anthony Battaglia, the Defendants' CFO, indicated that a Phase II consultant would be selected in mid-June 2007 and that studies would begin immediately thereafter. Evidence also suggested that the Defendants made further representations about conducting Phase II studies. These representations notwithstanding, the studies were never undertaken. In fact, an internal email indicated that the Defendants' negotiation position was that Phase II testing would not be commenced until after a deal was completed, despite Trovare's clear statements that Phase II studies were required before it would proceed and before lenders would commit to financing the transaction.

At some point during negotiations, the Defendants began investigating their own potential liabilities arising from a sale, which they called "exit costs" or "tail items." These included pension funding obligations, union notifications and negotiations, and potential environmental remediations. The exit costs became a concern for the Defendants, but the extent of their influence in the negotiations is unclear. Trovare argues that these costs actually poisoned the deal, leading the Defendants to terminate negotiations.

Following a July 27, 2007, conference call between the parties discussing an APA draft, Simkins conferred with members of his family regarding the sale. The family members, including Simkins, expressed concerns about the ability to close a favorable deal and disagreement over the values of the Defendants' assets and potential liabilities. As information about the family's concerns reached Cecola, Trovare's counsel informed him that the Defendants' counsel, Steve Gadon, had communicated terms contradicting those agreed to by Simkins in the July 27 conference call. Cecola began to fear that the Defendants' negotiating agents either lacked authority or acted without Simkins's knowledge and oversight.

Cecola requested to negotiate directly with Simkins to determine exactly where negotiations stood. Simkins, angry over their ensuing conversation, had an email sent to his negotiators on August 2, 2007: "Leon just called me [secretary] and said to tell you [accountant/advisor] that he definitely does not want to go through with the Trovare Transaction. He has intentions of operating with his children in charge." Neither this email nor Simkins's expressed intention was communicated to Trovare during the LOI's period.

Trovare, unaware of Simkins's decree, continued its attempts to reach a deal with the Defendants. Attorney Gadon responded to Trovare's attempts by listing the Defendants' non-negotiable points, including their refusal to perform Phase II inspections before the closing date, their refusal to extend the Termination Date (which effectively precluded the inspections, given

their duration), and their refusal to allow validation of their customer relations until after closing. Soon thereafter, however, Gadon noted that these demands had not been approved by Simkins and suggested that perhaps Phase II inspections could proceed so that Trovare could meet lender-underwriting requirements. Gadon notified Mesirow and all negotiators that the APA would not be drafted until after the inspections were complete and after he had a lender commitment letter from Trovare. Yet Trovare had informed Gadon that the inspections and APA were prerequisites to lender consideration. Further, later depositions showed that Simkins had already determined he would refuse any lender commitment letter and would insist on a cash transaction—a condition that Trovare had always made clear was a deal-breaker.

Mesirow employees had begun questioning the sincerity of the Defendants' negotiations. One employee sent an internal email asking if the Defendants were going to tell Trovare that it wouldn't allow due diligence investigations and if the Defendants were going to prevent investigations by every potential buyer. Battaglia, the Defendants' CFO, admittedly had begun avoiding calls from Mesirow and Trovare. When notified on August 13, 2007, of the unresolvable timing and sequencing issues of the APA, Phase II inspections, and lender commitment letter, another Mesirow employee observed, "This is dead." Later emails pre-dating the Termination Date included similar statements.

Determining that the Defendants had made it impossible to close a deal, Trovare sent a letter demanding

payment of the $200,000 break-up fee on August 21, 2007. Gadon responded with a refusal and five points that Trovare needed to agree to for the parties to continue negotiations. These points included restrictions on customer and employee access during due diligence investigations, no decreases in the price of sale, and evidence of a lender's unconditional financial commitment. When Gadon sought to follow up with Trovare's counsel regarding these demands, he further demanded a written release from the LOI.

Communications—and, therefore, purported negotiations—continued between Trovare and the Defendants into November 2007, well beyond the September 30 Termination Date. The Defendants' agents considered internal proposals in the first week of October, and Gadon contacted Cecola about unresolved points from earlier communications in the second week. Cecola responded, detailing concerns with what he viewed as impossibilities in the deal. In late November, a new proposal (which fundamentally differed from that contemplated by the LOI) arose, but no deal was ever consummated. Significantly, Simkins never communicated a change in his stance to either the Defendants or Trovare. As foretold by his August 2 email, Simkins transferred his controlling interests in the Defendants to his children, and his son became the president of the holding company.

Trovare sued the Defendants in diversity for an alleged breach of contract, seeking the $200,000 break-up fee because the Defendants allegedly knew or should have known that no transaction would be reached before the

Termination Date. Trovare claimed that the Defendants' purported negotiations lacked authority from their principal, Simkins, and were therefore merely dilatory tactics to avoid liability under Paragraph 14 of the LOI. It claimed that the Defendants refused, in violation of their duty of good faith and fair dealing, to issue a written notice of their termination in order to avoid paying the penalty.

The Defendants moved for summary judgment after discovery, arguing that the parties had merely taken strong and contentious negotiation positions, that all communications between them had represented good-faith negotiations, and that those negotiations continued after the Termination Date. The district court agreed with the Defendants that "the undisputed facts demonstrate that [they] did not terminate negotiations . . . and indeed continued negotiations in good faith beyond the termination date." It granted the Defendants' motion, and Trovare appeals that final judgment.

## II. ANALYSIS

"We review the district court's grant of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party." *Sutherland v. Wal-Mart Stores, Inc.*, 632 F.3d 990, 993 (7th Cir. 2011). Trovare argues that record evidence—properly construed in its favor—requires us to reverse the district court's entry of summary judgment. It argues that a trial is necessary to determine whether the Defendants owe a break-up fee under Paragraph 14 of the LOI.

The parties agree that Paragraph 16 made Paragraph 14 part of an enforceable contract between them. The district court correctly noted that Paragraph 14 contained a condition precedent to the Defendants' enforceable duty to pay the break-up fee: their provision of "written notice that negotiations toward a definitive asset purchase agreement are terminated." Conceding that no written notice was provided, Trovare fell back on the implied covenant of good faith and fair dealing imposed on parties to a contract under Illinois law.[2] *See Seip v. Rogers Raw Materials Fund, L.P.*, 948 N.E.2d 628, 637-38 (Ill. App. Ct. 2011); *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 193 (Ill. App. Ct. 2004). This implied covenant extends to circumstances where one party has complete control over the occurrence of a condition precedent, prohibiting the controlling party from acting capriciously and failing to take affirmative steps to satisfy the condition. *Midwest Builder Distrib., Inc. v. Lord & Essex, Inc.*, 891 N.E.2d 1, 26 (Ill. App. Ct. 2007). The district court accurately articulated how Trovare could prevail under its theory: "plaintiff would have to prove that defendant

---

[2] Because this is a diversity action, we apply Illinois choice-of-law rules to determine the applicable substantive law. *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 879 (7th Cir. 2009). Paragraph 18 of the LOI states: "This letter shall be governed by the internal laws of the State of Illinois without regard to conflict of laws." Neither party now challenges its adoption of Illinois substantive law, and we will apply it accordingly. *See Khan v. BDO Seidman, LLP*, 948 N.E.2d. 132, 148 (Ill. App. Ct. 2011).

had in fact decided to terminate negotiations during the term of the LOI, but refused to issue the notice of termination in bad faith."

The appropriate question on appeal is whether Trovare introduced evidence from which an objective trier of fact could conclude that negotiations had, in fact, terminated and that written notice thereof was deliberately withheld. If genuine issues of material fact persist on these points, the district court's entry of summary judgment was inappropriate. Fed. R. Civ. P. 56(a); *Sutherland*, 632 F.3d at 993. The district court concluded that no such issues persisted, as it was undisputed that Trovare and the Defendants kept trading proposals at least into October 2007. The district court entered summary judgment for the Defendants, stating that nothing in the record suggested they were simply stringing Trovare along to avoid any break-up fee obligation.

We cannot agree. If negotiations had indeed terminated in this case, the Defendants' refusal to issue a written notification of that fact to avoid triggering their duty to pay the break-up fee likely constituted bad faith. *See Midwest Builder Distrib., Inc.*, 891 N.E.2d at 26. While it is clear that communications continued into November 2007, whether they constituted actual negotiations is unclear. Given that the outcome of this litigation turns on classification of ongoing communications as negotiations, accurate classification is certainly material. And as record evidence shows that this material fact remains in dispute—and that the Defendants may have been only pretextually "negotiating"—summary judgment was inappropriate in this case.

Simkins clearly conveyed his state of mind regarding the potential sale of the Defendants' assets and properties to Trovare in his dictated message of August 2, 2007: he "definitely" did not want to go through with the transaction, preferring to transfer operations to his children. Despite the Defendants' concessions that such a definitive conclusion by the principal could constitute termination, (Appellee's Br. at 27), and that Simkins alone had control of the termination decision, they minimize the import of the email. They characterize it as an irrelevant "outburst" and argue that it did not contain an explicit edict to cease negotiations or to throw a "monkey wrench" into the negotiations. They argue that Simkins even personally participated in later negotiations, showing that no termination occurred.

The only evidence of his subsequent participation is a single letter dated August 28, 2007, in which Simkins wrote that he was "still prepared to make a deal," but conditioned any consideration of that deal on Trovare's capitulation to five demands in Gadon's letter of August 21. If those five demands were deliberately designed to preclude any possibility of closing the deal, nothing in the August 28 letter necessarily shows Simkins's intent to negotiate, and the letter would be entirely consistent with Simkins's never-withdrawn message of August 2. A rational trier of fact could reasonably conclude from the designated evidence that the Defendants' principal and decision-maker had conclusively determined that he would no longer consider a sale to Trovare. If he had, the determination effectively

terminated both the negotiations and his negotiators' authority.

Trovare acknowledges that it exchanged communications and proposals with the Defendants after Simkins's August 2 email—indeed, even after the Terminal Date. But it challenges the district court's characterization of those communications as negotiations. If Simkins's erstwhile agents lacked the authority to truly negotiate on his behalf, the communications between them and Trovare may have been—at best—attempts to draw their principal back into considering a favorable deal. But by interpreting the evidence in Trovare's favor, a rational trier of fact could conclude that the communications were actually bad-faith facades designed to avoid liability for the break-up fee.

For example, Battaglia had already misrepresented to Trovare that Phase II inspections were underway, while the Defendants had not and might have never intended to commission them. Later communications never remedied these misrepresentations. In addition, Gadon's August 21 letter demanded five concessions from Trovare that Defendants knew would likely preclude Trovare from securing financing; his September 5 letter also demanded a release from the LOI and any liabilities under it. The Defendants now spin these two letters as mere hard bargaining. But that is not the only permissible inference, and we must draw all reasonable inferences in Trovare's favor at this stage. These letters were preceded by emails from the Defendants' counsel reminding Simkins's agents to avoid breaching

their duty of good faith and asking them to review a chronology of events compiled to "show good faith negotiations" in case Trovare sued for the penalty. A fact-finder could reasonably infer that Gadon's letters were pretextual.

Even the brokers at Mesirow appear to have concluded that the communications no longer bore negotiation potential. Apparently having determined that negotiations were frustrated by the Defendants, Michael Simon inquired on September 5, 2007, "Is every buyer going to be be told that they can't do diligence [*sic*]?" On August 14, 2007, Bill Hornell wrote, "We're just about dead on Trovare/Simkins. Leon never trusted the buyer, so he insisted on negotiating an [APA] before giving the ok on final [due diligence.]" Indeed, just four days after Simkins's "outburst" foreswearing any deal with Trovare, Simon described the deal as "[d]ead as dead can be." The Defendants argued against making any inferences from these emails, stating that their characterizations were flatly contradicted by statements from a deposition of a Mesirow superior. But such contradiction goes to the weight of the evidence, an inappropriate considera-tion at the summary judgment stage.

We conclude that material questions of fact persisted as to whether actual negotiations continued after Simkins's apparent termination up to and beyond the Termination Date. The evidence at least suggests that misrepresentations and insistence on impossible condi-tions occurred. Either could constitute a breach of the Defendants' duty to negotiate in good faith under the

LOI. *See, e.g.*, *A/S Apothekernes Lab. for Specialpraeparater v. I.M.C. Chem. Grp., Inc.*, 873 F.2d 155, 158 (7th Cir. 1989) ("[A] party might breach its obligation to bargain in good faith by unreasonably insisting on a condition outside the scope of the parties' preliminary agreement, especially where such insistence is a thinly disguised pretext for scotching the deal . . . ."). The district court erred, therefore, in concluding that nothing in the record could suggest that the Defendants were simply stringing Trovare along to avoid the break-up fee.

Finally, we note that neither Trovare nor the Defendants requested a jury trial, so the district court will likely hear this case in a bench trial on remand. We recognize that "[i]f on a certain record a district court believes a party is entitled to summary judgment, then the same court, if required to conduct a bench trial on that same record, will probably decide the case for that same party." *Patton v. MFS/Sun Life Fin. Distribs., Inc.*, 480 F.3d 478, 484 (7th Cir. 2007). Indeed, a substantial amount of record evidence suggests that the Defendants were engaged in bona fide negotiations, including both their continued engagement of an array of attorneys, accountants, and others (which would be costly as a mere facade) and also the lack of any explicit directions from Simkins to stop the purported negotiations despite his awareness of them. On the current record, the district court might conclude that no breach of the duty of good faith and fair dealing in negotiations occurred.

But we simultaneously warned in *Patton* that "the winner of a bench trial might be uncertain even though

no new evidence will be presented." *Id.* at 484 n.2. Given the factual complexities—including the effect of Simkins's statements on his agents' authority and the accurate classification of communications as bona fide negotiations or empty facades—and the issues of credibility inherent in this case, additional evidence in the form of testimony may be presented on remand. Further, the district court's order under review did not—on its face, at least—weigh competing evidence. When it does weigh the evidence, it may reach a different conclusion. For these reasons, we "cannot say with certainty how the district court will resolve this case on remand," *id.*, so remand remains the appropriate remedy.

### III. CONCLUSION

The district court erred in determining that no genuine issues of material fact remained to be resolved in this breach of contract case. Accordingly, we REVERSE its entry of summary judgment and REMAND the case for further proceedings.