SIXTH DIVISION
November 9, 2007

No. 1-06-1233

MIDWEST BUILDER DISTRIBUTING, INC., )  Appeal from the
               )  Circuit Court of
     Plaintiff-Appellee,  )  Cook County, Illinois.
               )
               )
               )  No. 03 L 002292
v.             )
               )
LORD AND ESSEX, INC.,    )  Honorable
               )  Stuart A. Nudelman,
     Defendant-Appellant. )  Judge Presiding.

JUSTICE JOSEPH GORDON delivered the opinion of the court:

Plaintiff-appellee Midwest Builder Distributing, Inc. (Midwest), a company providing cabinets and appliances for homebuilders, brought suit against Lord & Essex, Inc. (Lord & Essex), a homebuilder. Plaintiff sought payment for materials delivered at defendant's request to defendant's construction sites, pursuant to a credit information sheet signed by defendant's representative prior to the execution of a series of subcontractor agreements between the parties.[1] Defendant claimed that the credit information sheet was not a binding contract and that it had fulfilled all its obligations under the subcontractor agreements, which controlled. The case proceeded to a bench trial, and the trial court found in favor of plaintiff on its breach of contract claim. For the following reasons, we affirm and remand for the court below to determine

---

[1] Midwest also had an unjust enrichment claim in its complaint, but it later voluntarily withdrew this claim, so it is not at issue on appeal.

1-06-1233

additional amounts owed under the credit information sheet.

I. BACKGROUND

Midwest filed its original complaint on February 24, 2003, which was subsequently amended twice. The second amended verified complaint, which now frames the issues, alleged the following.

Lord & Essex is a corporation engaged in the business of building homes, while Midwest is a corporation that specializes in providing cabinets and appliances for homebuilders. Sometime in October 2000, Christopher Smith, then the contracts manager of Lord & Essex, signed a credit information sheet provided by Midwest. Midwest averred this was done in order to induce Midwest to sell goods to Lord & Essex on credit. The credit information sheet, which is attached to the complaint, elicits general information (such as company name and address), as well as specific credit-related information (credit references, bank references, and sales information); however, only the former section is completed, and the credit-related part of the sheet remains blank. Near the bottom of the sheet, in small but readable text, is printed the following:

"In the event MBD, Inc. retains an attorney to pursue collection of payment by suit or in bankruptcy or probate proceedings, seller may recover reasonable attorney fees and costs of court and interest at a rate of 1 1/2% per month from the date payment became due.

The information contained in this statement is provided for the purpose of obtaining, or maintaining credit with you on behalf of the undersigned, or persons, firms, or corporations in whose behalf the undersigned may either severally or jointly with others, execute a guaranty in your favor. Each undersigned understands that you are

-2-

relying on the information provided herein (including the designation made as to ownership of property) in deciding to grant or continue credit."

Midwest's complaint further alleged that between October 2000 and January 2001, it executed various subcontractor agreements with Lord & Essex, whereby Midwest agreed to sell goods to Lord & Essex for use in five subdivisions where Lord & Essex was building homes. Copies of six of the eight agreements are attached to the complaint.

Three main provisions of the subcontractor agreements are relevant here. First, the contracts set out Lord & Essex's standard procedure for payment, known as the purchase order document system. The system works as follows: Lord & Essex sends out purchase orders and job release notices to each subcontractor, describing in detail the work to be performed for each house. Then, when a subcontractor delivers goods to a particular jobsite, a Lord & Essex representative signs both the purchase order and the contractor's job release notice as a way of indicating that the goods have been received and are of satisfactory quality. All the subcontractor agreements state that the aforementioned documents constitute "conclusive evidence" of the price of performance by Midwest. They also provide that Midwest "will accept payment based on the approved, signed Purchase Order System Document(s) as full and complete compensation for its work at the specified job site." Furthermore, in the last six contracts, Midwest's completion of the purchase order documents is made an express condition precedent to payment.

Second, all of the contracts provide that Midwest cannot commence any suit against Lord & Essex more than 10 months after "the date the work under the Agreement is completed." There is no reciprocal provision limiting the power of Lord & Essex to sue. The contracts do not

specifically define the time that Midwest's work is considered to be "completed." Midwest has an ongoing duty to perform warranty work for the 18-month period after installation of its goods, or the 12-month period after a house with its goods is sold; however, the last six contracts all contain a clause stating that completion "shall not be extended or tolled by repair, replacement, or warranty work."

Third, all of the contracts contain an integration clause that reads as follows: "This Agreement shall be construed as complete and fully integrated; that it supersedes all previous understandings, representations and agreements between the parties relating to the subject matter of this Agreement, all of the same being merged herein."

Pursuant to these subcontractor agreements, Midwest delivered goods to Lord & Essex, along with invoices describing the items and the agreed-upon prices. The invoices are attached to the complaint as well; each contains a note at the bottom reading, "Thank you for your order!!! There will be a 1.5% interest charge on any invoices past 30 days."

Midwest then alleged that Lord & Essex failed to pay for the goods that Midwest delivered, in breach of the provisions contained in both the credit information sheet and the subcontractor agreements. It therefore requested relief in the form of $58,608.88 in unpaid principal, plus 1.5% monthly interest, court costs, and attorney fees pursuant to the terms of the credit information sheet.

In its answer, Lord & Essex admitted that its agent Smith signed Midwest's credit information sheet, but it denied that the sheet was a binding contract between the parties. Lord & Essex further averred that, even if the credit information sheet were to be considered a contract,

its terms would be superseded by the terms of the subcontractor agreements later signed by the parties; thus, the provisions for interest, attorney fees, and court costs would all be invalidated.

As to the subcontractor agreements themselves, while Lord & Essex agreed that they were signed by the parties, it claimed that Midwest did not live up to their terms, as set forth in its two affirmative defenses.[2] Its first defense was that Midwest's failure to follow the purchase order document system described in the subcontractor agreements barred any recovery by Midwest. It contended that because this failure constituted a material breach on the part of Midwest, Lord & Essex had no obligation to pay for any goods where the system was not strictly complied with. It also argued that Lord & Essex would be deprived of valuable, specifically bargained-for consideration if the system were not enforced as written in the contracts.

Second, Lord & Essex argued that Midwest's suit was untimely, since the contractual 10-month limit on suits had already passed by the time that Midwest initiated proceedings against Lord & Essex. Lord & Essex pointed out that in its complaint, Midwest did not allege that it performed any work unrelated to warranties or repairs after February 2002, nor did it provide any documentary evidence of such work; therefore, since the complaint was filed more than 10 months after February 2002, it was time-barred.

A bench trial commenced on March 3, 2006. The first witness called by Midwest was company president John Lomacz. No court reporter was present for the first day of trial; missing

---

[2] Lord & Essex also filed a counterclaim against Midwest, alleging that Midwest owed it backcharges for late delivery of goods under the subcontractor agreements. However, the trial court rejected that claim, and Lord & Essex does not contest this finding on appeal.

1-06-1233

from the record is all of Lomacz's direct testimony, as well as the beginning of his cross-examination. As will be discussed below, there is no certified bystander's report of the first day's proceedings. After that first day, Lord & Essex hired a court reporter to cover the rest of the trial.

On the second day of trial, under cross-examination, Lomacz testified that as president of Midwest, he was familiar with the books and records of the company. He said that the last time that Midwest delivered product to Lord & Essex was in November or December of 2001. He also spoke briefly about the credit information sheet, saying that in his opinion, it was a binding contract. The remaining portions of his testimony largely concerned Midwest's computation of the amount that Lord & Essex owed, according to various accounting documents prepared by Midwest.

On redirect, Lomacz testified at length about the purchase order system. The system was supposed to work as follows: Lord & Essex would send a contractor's job release notice and a purchase order to Midwest in the mail. The contractor's job release notice would provide specifications about the work to be done. When Midwest delivered the requested products to the jobsite, Lord & Essex was supposed to sign off on the documents. He testified that Lord & Essex "dozens and dozens of times" took the position that without the signed papers, it had no obligation to pay Midwest. However, on multiple occasions, Lord & Essex failed to have on-site representatives available to sign the documents. As a result, there were "dozens" of times that Midwest delivered goods but never got signatures for their purchase orders or contractor's job release notices. Midwest had no recourse but to repeatedly call and fax Lord & Essex with

requests that the documents be signed. In June 2001, Lomacz called a meeting with Russ Cusimano, Midwest's credit manager, and Smith to discuss the problems with the system: "Those documents weren't being signed, people weren't at job sites, and we weren't getting paid." According to Lomacz, Smith authorized Cusimano to sign off on certain purchase order system documents in cases where there was nobody at the jobsite to sign.

Lomacz also testified about the warranty work requirement under the subcontractor agreements, which imposed a duty on Midwest to fix defective products. Lord & Essex last called Midwest to perform warranty work "sometime in 2004." Furthermore, Lomacz said that there were still unresolved warranty issues between the parties; since Lord & Essex had not paid for the goods delivered, Midwest refused to perform further warranty work.

Next, Midwest called Smith as an adverse witness. Smith testified that in 2000–02, he was employed at Lord & Essex as both contract manager and production manager; his key duties were hiring subcontractors, monitoring their performance, and enforcing the terms of their contracts. Hence, he was the one who knew the most about his company's dealings with Midwest. John Popp, later identified as the president of Lord & Essex, was rarely on the actual jobsites and thus relied heavily upon information provided by Smith.

Smith testified that he was in charge of negotiating the pricing and product specifications with Midwest. He admitted to signing the credit information sheet. However, he said that he did not read it before signing it, since Todd Fouch, the half owner of Midwest at the time, assured him that "this was only so you [Midwest] can do a credit background check. End of story." Counsel for Midwest then impeached Smith with his earlier deposition testimony in which he

stated that he had read the sheet.

Smith also discussed the subcontractor agreements signed by the parties, telling the court, "my contracts refer to what the specifications – what you are supposed to do." Describing the contracts in greater detail, he said, "what we basically prepared was the layout, pricing, delivery dates, colors, styles, product brand of appliances."

Smith then spoke about the importance of the purchase order system. Pursuant to Lord & Essex's standard business practice, Smith threw away all Midwest invoices he received. He said, "I am very specific when I say we paid off our purchase order with the contractor's job release notice, which shows all the options." As a result, he explained, subcontractors' own invoices are irrelevant to payment, and he tells subcontractors this when they are entering into contracts with him. However, when asked whether a signed purchase order was always necessary for payment, he responded, "No. I pay off of the contractor job release notice, unless there is something very special going on."

As for the course of performance with Midwest, Smith testified that he did not always follow contract procedures to the letter; instead, he said that "Russ [Cusimano] and I had an agreement, yes, and we were working very well." When discrepancies arose between Lord & Essex's paperwork and Midwest's claims about what goods it had delivered, Smith would personally go out to the subdivisions and take a physical inventory of the relevant houses. If the goods were present, then Smith would call up Cusimano, who would write "okay per Chris Smith" on the contractor's job release notices (though according to Smith, Cusimano was never authorized to sign for him). Cusimano would then return the documents to Smith for his

1-06-1233

signature.

Asked whether there were occasions where no Lord & Essex representative was available on site to sign documents, Smith responded, "Only if I fired them." At first, he denied that he had done any such thing. Upon further questioning, Smith admitted firing Bob Remiclub, a field supervisor for Lord & Essex, for not doing his job correctly. He also stated that he had heard complaints from Midwest about lack of on-site representatives, but his workers told him that those reports were untrue.

Smith also testified that he believed there were still jobs that Midwest had not completed. Speaking about billing disagreements that Lord & Essex had with Midwest, Smith said, "It was in regard to the delivery showing up without purchase orders, short deliveries, not being able to close houses on time, back charges regarding plumbers making trips, countertop people making trips, and cabinets not complete, numerous occasions." He also said that problems arose with "shortages [and] warranty items," and that "not all of them" had been corrected. However, Smith also admitted that there were times when Lord & Essex was unable to keep precise delivery records. He agreed with counsel's statement that as a result of this confusion, there came a point where Lord & Essex "could no longer determine who was supplying what cabinets and who was supplying what appliances in [Lord & Essex's] units."

With respect to the jobs that were finished, Smith told the court that Lord & Essex had sold almost all of the houses with Midwest's goods in them. When the houses were sold, title to the cabinets and appliances passed to the buyers.

Midwest then called Lee Ann Lomacz to the stand. Her exact relation to the parties is not

fully apparent from the record, but she is identified without objection in the parties' briefs as the wife of John Lomacz. Lee Ann Lomacz testified that she delivered goods from Midwest to Lord & Essex's jobsites around 15 to 20 times. More than once, when she arrived at the jobsite, nobody from Lord & Essex was present to sign her purchase order. When this happened, she would simply write "Delivered by Lee" on her pick ticket (later explained by Midwest's counsel as a Midwest document indicating delivery of goods).

Midwest's final witness was Paulette Debartolo, operations manager of Midwest for the past 7 1/2 years. She testified about Midwest's accounting procedures and the way in which Midwest calculated the amounts that were still owing. During cross-examination, counsel for Lord & Essex questioned the accuracy of her documents; Debartolo admitted that she was not familiar with the contract and did not know whether the invoice prices matched those in the contract.

At the close of Midwest's case, Lord & Essex moved for a directed verdict. The motion was denied in its entirety. The judge told counsel for Midwest that the time had come for them to choose between proceeding on a contract theory and an unjust enrichment theory; counsel for Midwest voluntarily withdrew their unjust enrichment claim.

Lord & Essex then opened its defense by calling Smith to the stand. Smith testified that earlier, when he spoke of work that Midwest had left undone, he was referring to warranty work. He said that Midwest's last delivery under the contract was in November 2001. He also said that in November 2001 he confirmed what Midwest had or had not delivered by taking a physical inventory of all houses where Midwest was supposed to provide goods. On cross-examination,

Smith was impeached by his August 2005 deposition testimony in which he had stated that he was not sure exactly what cabinets and appliances had been delivered by Midwest.

Lord & Essex next called John Lomacz as an adverse witness. He testified that he was not present when Midwest vice president Fouch presented the credit information sheet to Smith. As for the effect of the sheet, he said that Midwest will typically run a credit check on credit applicants by consulting Dun & Bradstreet or calling vendors that the applicant is working with; he believed that some kind of credit check had been done on Lord & Essex, but he did not know the details. Once the check was complete and Midwest decided to accept Lord & Essex as a creditor, Midwest sent a letter to Lord & Essex containing the terms on which credit was being offered.

Finally, Lord & Essex called its president Popp to testify. Popp confirmed Lomacz' earlier testimony about the way in which the purchase order document system was supposed to work, stressing the fact that the Lord & Essex supervisor is not supposed to sign any purchase order before confirming that the subcontractor has delivered all material as required by contract. He also said that payment is based solely on Lord & Essex's documentation, not on invoices sent by subcontractors such as Midwest. The reason he gave for this procedure was that it was necessary to prevent fraud: "The only way I would know [if a subcontractor had delivered goods] is by reviewing the invoicing to make sure that we have signed purchase order and a signed job release notice."

On cross-examination, Popp began by contending that Lord & Essex had paid for all goods for which Midwest had submitted the proper signed documentation. Counsel for Midwest

then presented a document from Lord & Essex, dated February 2002 and regarding the contract with Midwest, stating, "Our records show we agreed with $12,252.58 in outstanding payable purchase orders." Popp conceded that the amount had never been paid to Midwest and was still owing.

Popp reemphasized the importance of the purchase order system, stating that a signed contractor's job release notice without a signed purchase order is insufficient for payment. However, he testified that he does not spend much time on the jobsites and must rely heavily on reports from employees in the field. Hence, although he had not heard about instances where no Lord & Essex representative was available to sign purchase order system documents, he admitted that he would not necessarily know if such a thing had happened.

On March 13, 2006, the trial court issued a judgment in favor of Midwest, ruling that the credit information sheet was an independent, binding contract requiring Lord & Essex to pay for all goods bought on credit, and also ruling that its terms were not controlled or superseded by the later subcontractor agreements. The court explicitly rested its decision upon the credibility of Lomacz' testimony, as well as the credibility of Midwest's accounting documents presented at trial when compared to Lord & Essex's documents. The court subsequently ordered Lord & Essex to pay $128,697.73, reflecting principal, interest, attorney fees, and costs all owed under the credit information sheet. It calculated the amount of principal owed based on the invoices presented by Midwest at trial.

Because the trial court based its ruling on the credit information sheet, it made no explicit finding as to the extent of Midwest's compliance with the purchase order system, nor did it apply

the 10-month limitation on suits against Lord & Essex contained in the subcontractor agreements. However, in passing, the court indicated that the 10-month time limit might be invalid under principles of equity, at least to the extent that it did not allow the deadline to be tolled by Midwest's warranty work requirements.

It is undisputed in the parties' briefs that after the final judgment was handed down, the trial judge retired and the original trial exhibits were thrown away. These trial exhibits are listed and briefly described in the trial transcript, though of course not fully detailed. Several of the exhibits contain correspondence between Midwest officials and Lord & Essex officials (in particular, several letters from Cusimano to Smith), though the record we have is largely silent on the contents of these letters. Also included are Midwest's invoices for appliances delivered, as well as contractor's job release notices signed by Lord & Essex and various lengthy accounting documents from both sides that the court used for purposes of damage computation.

Lord & Essex belatedly submitted a proposed bystander's report regarding the missing first day's testimony and the exhibits presented on that day to the court, pursuant to Illinois Supreme Court Rule 323(c) (210 Ill. 2d R. 323(c)), along with a motion requesting the court to certify its report. Midwest responded by filing an objection, in which it urged that the court should deny certification of any bystander's report because the only judge present at trial had retired; in the alternative, Midwest also submitted its own proposed bystander's report, which it stated was much more accurate and complete than the one provided by Lord & Essex. The court refused to certify either proposed report, though both of the proposals have been included as part of the supplemental record. Furthermore, Midwest declined to stipulate to the content of the first

day's testimony or to the contents of the discarded exhibits. Hence, Lord & Essex proceeded with the appeal without a bystander's report, and we are left to decide this case without any confirmed record of the first day's proceedings.

II. ANALYSIS

A. Effect of the Incomplete Record

Before we reach the substantive issues of this case, there is a procedural matter that must first be resolved: the impact of the missing first day's testimony and trial exhibits. Midwest argues that due to this gap in the record, we lack the ability to meaningfully assess the merits of the case and therefore have no choice but to affirm the decision of the court below. In support of this contention, it cites the statements by the trial court indicating that the credibility of the first day's testimony and the contents of the exhibits were material to its decision. Lord & Essex, however, contends that the record presented is sufficient for us to deliver substantive judgment.

It is the appellant's duty to present the court with a proper record on appeal, so that the court has an adequate basis for reviewing the decision below. *Cooper v. United Development Co.*, 122 Ill. App. 3d 850, 860, 462 N.E.2d 629, 636 (1984). Under Illinois law, if there is no direct transcript of the trial proceedings, the appellant may prepare a bystander's report summarizing the events that occurred, but such report may not be included in the record unless it is certified by the court or unless the parties stipulate to it. 210 Ill. 2d R. 323(c).

When there is a gap in the record that could have a material impact on the outcome of the case, the reviewing court will presume that the missing evidence supported the judgment of the

trial court and resolve any doubts against the appellant. *In re Marriage of Rogers*, 213 Ill. 2d 129, 140 n.2, 820 N.E.2d 386, 392 n.2 (2004); *Cooper v. United Development Co.*, 122 Ill. App. 3d at 860, 462 N.E.2d at 636; *Tekansky v. Pearson*, 263 Ill. App. 3d 759, 764, 635 N.E.2d 605, 609 (1994). However, in instances where the court has all the evidence it needs to make a proper decision on the merits under the appropriate standard of review, the court may undertake substantive analysis of the case even if the record is not fully complete. *Gonella Baking Co. v. Clara's Pasta Di Casa, Ltd.*, 337 Ill. App. 3d 385, 388, 786 N.E.2d 1058, 1061 (2003) (reviewing a trial court's ruling on a motion to dismiss despite appellant's failure to provide a transcript of the hearing on the motion, reasoning that the pleadings and supporting documents were sufficient grounds for a decision); *In re Marriage of Ward*, 282 Ill. App. 3d 423, 430, 668 N.E.2d 149, 153-54 (1996). The test to be applied is whether "this court is in the same position as the trial court" with respect to the legally operative facts of the case. *Gonella Baking Co.*, 337 Ill. App. 3d at 388, 786 N.E.2d at 1061.

Lord & Essex takes the position that the content of the missing first day's testimony and the discarded exhibits would be unable to affect the disposition of the key issues at stake. In particular, it contends that the parties' contractual obligations can be decided *de novo* as a matter of law purely on the basis of the text of the subcontractor agreements, without need to reference any testimony or any further documents that may have been produced at trial. As a result, Lord & Essex concludes that we are able to undertake substantive review of Midwest's breach of contract claim under the standard articulated in *Gonella*. This argument is not without merit. As shall be discussed in greater detail below, there are indeed some purely legal issues at stake that

are not affected by the omitted portion of the record. However, to the extent that the decision may be impacted by testimony or documentary exhibits that have not been brought before us, the contents of such omitted portions of the record will be presumed to favor Midwest. See *Cooper v. United Development Co.*, 122 Ill. App. 3d at 860, 462 N.E.2d at 636. As shall be more fully discussed below, this case raises critical questions regarding the course of conduct between the parties which may have bearing on issues of waiver and estoppel, and which cannot be determined solely on the basis of the documents contained in the record.

Lord & Essex also contends that to the extent that the record is inadequate, fault lies with Midwest for refusing to stipulate to the contents of the testimony and exhibits offered on the first day. In its reply brief it avers that it sought to negotiate with Midwest's counsel but was repeatedly rebuffed. Even if this contention were true, it would have no effect on our ruling. Diligence and lack of fault are not excuses for an appellant's failure to present an adequate record on appeal. We apply the same standard here as the court did in *Tekansky v. Pearson*, where it upheld the decision of the court below due to the complete lack of a certified record of proceedings. *Tekansky v. Pearson*, 263 Ill. App. 3d 759, 764, 635 N.E.2d 605, 609 (1994). The appellant in that case claimed that his arguments deserved consideration because his counsel made a "very concerted effort to procure a court reporter's services for this trial." *Tekansky v. Pearson*, 263 Ill. App. 3d at 763, 635 N.E.2d at 609. In rejecting this argument, the *Tekansky* court noted that "regardless of defendant's alleged diligence, the fact remains that a proper report of proceedings is not before this court." *Tekansky v. Pearson*, 263 Ill. App. 3d at 764, 635 N.E.2d at 609. It is the appellant's duty to facilitate a fair decision on the merits; notwithstanding

any effort which may have been expended by counsel for Lord & Essex, we simply cannot decide this case if crucial pieces of evidence are not preserved and brought before us.

In this case, we have something that may well serve as an equivalent of a certified bystander's report, at least in part: the proposed bystander's reports contained in the supplemental record. As discussed above, we may not accept these uncertified reports as true, under Supreme Court Rule 323(c). A self-serving report presented by one of the parties cannot be used against the other party unless certified or stipulated to. Such a report is obviously unreliable and untrustworthy, due to the litigants' stake in the outcome of the case. Yet there is no apparent reason that such a report might not be used against its own proponent; the proponent cannot claim that it is false or unreliable, since he has vouched for its trustworthiness by submitting it.

Therefore, we shall feel free to use Midwest's account of the first day's events to the extent that it assures us that the issues are sufficiently preserved in the remaining record for us to reach the merits of the case without necessitating any reference to the first day's proceedings. Midwest is adamant that the missing testimony was vital to the trial court's decision, yet if its own report demonstrates that there is nothing of material importance contained in that testimony, we may proceed with our analysis. In this case, Midwest's bystander's report contains the testimony of its own president, in which he discussed the impact of the credit information sheet and advanced his opinion of its legal impact. As shall be demonstrated below, that testimony, even if taken as true, would not have any bearing upon our ultimate determination of the status of that instrument in the face of the various subcontractor agreements that were signed by the parties.

1-06-1233

We are persuaded based on Midwest's own bystander's report that the first day's proceeding, as described by Midwest, would have no bearing upon this court's resolution of the issues raised in this appeal.

Of greater concern, however, is the matter of the missing trial exhibits. If properly presented to us by Lord & Essex, these exhibits might have been quite significant to our decision, because they could very well have shed light on the course of performance between the parties, which is crucial to the ultimate issue of liability. The potential significance of these documents shall be more fully developed later. For now, it will suffice to say that the gap in the documentary record is sufficiently serious that we cannot fully reach the merits of the case, and thus our only proper course is to affirm on the issue of liability. However, as shall also be detailed in the sections that follow, even if we were to proceed to the merits of this case on the basis of the limited information we now have, our decision would not change.

B. Obligations Under the Credit Information Sheet

Midwest contends that the credit information sheet forms an independent and binding agreement for the sale of goods that Lord & Essex has breached. In the alternative, it urges that it is also entitled to payment under the subcontractor agreements because of Lord & Essex's actions during the course of performance. On the other hand, Lord & Essex contends that its contractual obligations are derived solely from the subcontractor agreements; it argues that the credit information sheet lacks essential terms to be a contract, and even if it were a contract, its terms would be entirely superseded by the later subcontractor agreements. It also claims to have fulfilled all its obligations under the subcontractor agreements, due to Midwest's failure to comply

1-06-1233

with the terms of the purchase order document system.

To unravel this conflict, we begin by examining the provisions of the credit information sheet, because this is the document upon which the trial court premised Lord & Essex's liability. We shall then move on to discuss the effect that the subcontractor agreements have upon the credit information sheet, as well as the parties' duties under the subcontractor agreements.

In determining the parties' obligations under the sheet, the first question is whether the sheet is a source of obligations at all. Lord & Essex contends that Midwest has failed to show that the credit information sheet contains consideration, which is one of the most basic requirements for a contract. Consideration is defined as "any act or promise which is of benefit to one party or disadvantageous to the other" – i.e., some form of bargained-for exchange between the parties. *Ahern v. Knecht*, 202 Ill. App. 3d 709, 715, 563 N.E.2d 787, 791 (1990). Furthermore, Lord & Essex contends that any terms that may be contained in the sheet are too nebulous and uncertain to be legally enforceable. It is a well-established precept that for an agreement to be legally binding, it must be reasonably definite and certain in its terms. "When material terms and conditions are not ascertainable, there is no enforceable contract, even if the intent to contract is present." *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d 224, 229-30, 601 N.E.2d 956, 960 (1992), citing *Academy Chicago Publishers v. Cheever*, 144 Ill. 2d 24, 578 N.E.2d 981 (1991). However, the Uniform Commercial Code (UCC) interprets this doctrine flexibly: "Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy." 810 ILCS 5/2-204(3) (West 2006).

Lord & Essex argues that certain terms essential to a credit agreement cannot be ascertained from the document and, therefore, it cannot be considered a contract. It is true that many provisions that one would ordinarily expect in a credit agreement are absent from the document: for instance, there is no stated due date for payments, and there is no credit limit placed upon Lord & Essex. All it contains are blanks for general company information, specific credit-related information, and provisions concerning attorney fees, court costs, and interest on overdue payments. This, by itself, is not fatal to Midwest's position that the credit information sheet is a binding contract; the mere fact that more terms could potentially have been included in the agreement does not invalidate any terms that are actually present.

Nevertheless, there is a deeper impediment to viewing the credit information sheet as a contract: simply taking the sheet at face value, it is questionable whether Midwest has promised anything of value to Lord & Essex, as required under *Ahern v. Knecht*, 202 Ill. App. 3d at 715, 563 N.E.2d at 791. Clearly, by signing the sheet, Lord & Essex pledges that if Midwest retains an attorney to pursue collection of overdue payments by suit, then Lord & Essex will pay fees, court costs, and interest on those payments. Yet it is much less clear what Midwest will do in exchange for this pledge. As noted previously, the credit information sheet does not outline any duties that the parties might have regarding delivery of merchandise. It is arguable that Midwest is agreeing to sell goods to Lord & Essex, as evidenced by the use of the word "seller" to refer to Midwest. A promise to enter into a later contract – *e.g.*, a contract for the sale of goods – is sufficient consideration to render an agreement binding. See R. Lord, Williston on Contracts §33.24 (4th ed. 1999). However, with no further elaboration, the term "seller" may lack the

necessary certainty to form a legally enforceable duty. Imagine, for the sake of argument, that Lord & Essex were to sue Midwest for breach of contract based on the credit information sheet; though the sheet may allude to contemplated future sales, it would be hard to define Midwest's duties with sufficient specificity that Lord & Essex could establish breach. It is therefore also arguable that the credit information sheet lacks the consideration necessary to be a binding contract.

Where there is such ambiguity and incompleteness in the document itself, we may turn to outside sources in order to ascertain the intent of the parties. *Eichengreen v. Rollins, Inc.*, 325 Ill. App. 3d 517, 522, 757 N.E.2d 952, 956 (2001). This is one instance in which the missing trial exhibits containing various communications between the parties might be material to our decision: if those exhibits demonstrated that both of the parties understood the credit information sheet to entail a definite duty on the part of Midwest to sell goods to Lord & Essex, that would be evidence that Midwest was genuinely offering consideration in exchange for Smith's signature, which could well be sufficient for the credit information sheet to be a valid contract. As we do not have the relevant exhibits at hand, we shall assume that this gap in the record supports the trial court ruling and that the missing correspondence is sufficient to establish mutuality of obligation between the parties.

However, the inquiry does not end with our determination that the agreement contained in the credit information sheet is legally enforceable. To determine Lord & Essex's potential liability under the sheet, we not only need to know whether it is an independent, binding contract, but we need to elucidate what the terms of that contract are. Specifically, we must determine whether it

establishes any primary payment obligation on the part of Lord & Essex.

Midwest contends that the terms of the credit information sheet "not only obviously require defendant to pay for any goods sold on credit but also specify that plaintiff may recover attorney's fees and 1 1/2% monthly interest on overdue balances." But in fact, it is not at all obvious from the face of the contract that it creates any duty on the part of Lord & Essex to pay for goods. The most natural reading of the text is that *if* Lord & Essex owes money to Midwest, and if Midwest pursues collection by suit, then it can collect attorney fees and interest – but in and of itself, it does not establish that Lord & Essex actually owes any money to Midwest for goods delivered.

Indeed, Midwest inadvertently alludes to this in its brief, where it draws an analogy between the credit information sheet and a credit card contract: "the user is bound to pay interest at a certain rate, and incurs certain penalties for non-payment regardless of what goods are being purchased." Credit cards do not establish any primary payment obligation on the part of the holder. One cannot look to a credit card agreement to determine whether or not goods have been purchased; one can only determine such matters by looking to subsequent contracts of sale. To take the analogy a step further, in the absence of automatic fee provisions, there can be no breach of a credit card contract unless the card owner has entered into other contracts to buy goods based upon that credit.

The trial court implicitly found that the credit information sheet contained a duty to pay for any goods delivered which was independent of any obligation incurred under the subcontractor agreements; for instance, the ruling speaks of "amounts due and owing pursuant to

the credit agreement." However, the court never states where in the wording of the credit information sheet it finds such an obligation. Such a reading is not grounded in the text in any way; as discussed above, the granting of credit is an entirely separate matter from the imposition of a primary obligation to pay for goods sold.

We find that even if Lord & Essex cannot claim, because of the absence of the clarity that the missing exhibits could have afforded us, that the credit information sheet lacks the requisite specificity to be a binding contract of any sort, the sheet cannot be an independent basis for contractual liability. It provides only, at best, that its terms are relevant should Lord & Essex become indebted through some other contract. Lord & Essex then would become liable for collection costs, including attorney fees, interest, and court costs. However, there is nothing in the credit information sheet to establish any preexisting indebtedness for any material delivered or services provided by Midwest. Thus, the credit information sheet at best would only function as a source of contingent liability should money be owed under another contract.

C. Interaction Between the Credit Information Sheet and the Subcontractor Agreements

Lord & Essex urges, however, that even if the credit information sheet were a legally binding agreement, whether as a legally independent basis for liability or as a contingent one, it would be superseded by the subcontractor agreements. It contends that the subcontractor agreements are fully integrated, so they override all previous negotiations between the parties, including everything contained in the credit information sheet. Midwest, on the other hand, takes the position that the terms of the credit information sheet are outside the scope of the

subcontractor agreements and thus are not subject to integration.[3]

A contract is integrated when the parties intend it to be a final and complete expression of the agreement between them. *Koester v. Weber, Cohn & Riley, Inc.*, 193 Ill. App. 3d 1045, 1048, 550 N.E.2d 1004, 1006 (1989). Whether an agreement is fully integrated is a question of law, to the extent that the agreement is unambiguous, so we consider it *de novo*. *Air Safety, Inc. v. Teachers Realty Corp.*, 185 Ill. 2d 457, 462, 706 N.E.2d 882, 884 (1999); *Geoquest Productions, Ltd. v. Embassy Home Entertainment*, 229 Ill. App. 3d 41, 45, 593 N.E.2d 727, 730 (1992), citing *Pecora v. Szabo*, 94 Ill. App. 3d 57, 418 N.E.2d 431 (1981).

The effect of integration is to "preclude[] evidence of understandings, not reflected in a writing, reached before or at the time of its execution which would vary or modify its terms." *J&B Steel Contractors, Inc. v. C. Iber & Sons, Inc.*, 162 Ill. 2d 265, 269, 642 N.E.2d 1215, 1217 (1994). Even the introduction of additional consistent terms is barred. *J&B Steel*, 162 Ill. 2d at 273, 642 N.E.2d at 1219; *Eichengreen v. Rollins*, 325 Ill. App. 3d 517, 523-24, 757 N.E.2d 952, 958 (2001). As the Illinois Supreme Court has said, "parol evidence cannot be admitted to add another term to the agreement although the writing contains nothing on the particular term to which the parol evidence is directed." *Armstrong Paint & Varnish Works v. Continental Can Co.*, 301 Ill. 102, 106, 133 N.E. 711, 713 (1921); see also R. Lord, Williston on Contracts §33.23 (4th ed. 1999). This is sometimes referred to as the "four corners" rule: when interpreting an

---

[3] Note that since the subcontractor agreements are contracts for the sale of goods (cabinets and appliances), they are governed by Illinois' version of the Uniform Commercial Code (810 ILCS 5/2-101 *et seq*. (West 2006)). See 810 ILCS 5/2-102 (West 2006).

integrated contract, courts are limited to considering material that lies within the four corners of the text, rather than resorting to extrinsic evidence. *Air Safety*, 185 Ill. 2d at 462, 706 N.E.2d at 884. Hence, to the extent that the subcontractor agreements are integrated, their terms will override any other prior or contemporaneous negotiations between the parties relating to their subject matter, including any terms that might be contained in the credit information sheet.

In the case at hand, each subcontractor agreement contains an integration clause that purports to supersede "all previous understandings, representations and agreements between the parties relating to the subject matter of this Agreement." This clause is strong evidence of the parties' intent, not only to be bound by the agreement, but to have it override conflicting provisions that may have been contained in previous or contemporaneous dealings between the parties. When such a clause is present, Illinois courts will accept it at face value as an expression of the parties' will that the written contract be the final deal. See *Air Safety*, 185 Ill. 2d at 464-66, 706 N.E.2d at 885-86 (holding that the four corners rule prohibited consideration of extrinsic evidence when interpreting a contract with a sweeping integration clause).

However, even if a contract is integrated, the scope of integration does not extend infinitely to any and all dealings that might have occurred between the parties. Evidence of an extrinsic agreement may be admissible if it is "so far a separate and distinct matter as to be capable of existence as an independent legal act." R. Lord, Williston on Contracts §33.23 at 678 (4th ed. 1999); see *Rowe v. Allely*, 244 Neb. 484, 507 N.W.2d 293 (1993) (holding that the parol evidence rule did not affect a prior agreement that was separate and distinct from the contract under consideration). Under the UCC, the test to be applied is whether the terms of the alleged

parol agreement "would certainly have been included in the document"; if so, then evidence of such an agreement is inadmissible. 810 ILCS Ann. 5/2-202, Comment 3 (West 2006). If not, then the parol agreement may be considered by the trier of fact as long as its terms are not inconsistent with the terms of the primary agreement.

Lord & Essex contends that under *Air Safety*, 185 Ill. 2d at 464-66, 706 N.E.2d at 885-86, the integration clause in the subcontractor agreements precludes us from considering the credit information sheet at all in determining the parties' obligations. Midwest, on the other hand, contends that the credit information sheet is an independent contract whose terms are entirely outside the subject matter of the subcontractor agreements, so it is independently enforceable, regardless of whether the subcontractor agreements are integrated. The trial court ruled in Midwest's favor on this issue, saying that the credit information sheet "is a separate and distinct contract outside of any integration clause of the various contracts, subcontracts submitted"; as a result, it found that the credit information sheet was admissible in its entirety. Yet as discussed above, we are not bound by this determination, since we review the issue of integration *de novo*.

To determine the scope of integration of the subcontractor agreements, we must next determine the intended subject matter of the contracts. Midwest advocates an extremely narrow view of their subject matter, going to some length in its brief to paint them as focused exclusively on the specifications of the products to be delivered. However, we think it clear that the primary payment obligations of Lord & Essex are also a central component of the subcontractor agreements, since this payment is the consideration for which Midwest agreed to deliver the goods in question. Because such duties are within the heart of the subject matter of the

subcontractor agreements, pursuant to the integration clause, the terms of the subcontractor agreements would have preempted and superseded any and all such duties regarding payment that might have been incurred under the credit information sheet.

With respect to specific remedies, the situation is more complex. Midwest urges that because remedies for breach by Lord & Essex are not mentioned in the subcontractor agreements at all, they are not part of its subject matter. Thus the credit information sheet's provisions for interest and attorney fees remain separate and distinct from the later contracts and are not subsumed by them. Lord & Essex naturally takes a much broader view of the scope of the subcontractor agreements, arguing in its reply brief that the agreements extend to "any contractual legal obligation between the parties." In particular, it contends that the omission of specific remedies for breach was intentional. That is, instead of remedies being a remote subject that lies beyond the scope of the subcontractor agreements, they were contemplated by the parties, who purposefully chose not to include them in the contract.

While the language of the contract itself is ambiguous and both interpretations are plausible, we believe that Midwest has made the superior argument here. In support of its contention that remedies are part of the subject matter of the contracts, Lord & Essex offers nothing but a bare presumption of intentionality, without supporting evidence besides the fact that both parties are sophisticated commercial entities. There is no text in the subcontractor agreements that deals with omission of remedies or purports to clash or overlap with the remedies provided under the credit information sheet. Nor is there relevant testimony that would tend to show that the documents were drafted deliberately to avoid mention of them. Hence, we find that

the subcontractor agreements do not extend to the issue of remedies. See 810 ILCS Ann. 5/2-202, Comment 3 (West 2006); R. Lord, Williston on Contracts §33.23 (4th ed. 1999). The provisions in the credit information sheet for interest, court costs, and attorney fees in the event that Midwest pursues collection by suit are not subsumed by the subcontractor agreements, but are enforceable as consistent terms of an independent agreement under Section 2-202 (810 ILCS 5/2-202 (West 2006)).

D. Obligations Under the Subcontractor Agreements

Since any primary payment obligation must come from the subcontractor agreements, we now turn to consider them. Lord & Essex raises two potential obstacles to Midwest's recovery under the subcontractor agreements: one procedural, the time limitation on lawsuits, and one substantive, the required purchase order document system.

Lord & Essex first contends that the 10-month limit on suits against Lord & Essex bars any recovery by Midwest under the subcontractor agreements. This claim raises an interpretive issue: Because the clock only starts ticking when work is "completed" under the agreements, we must decide what it means for work to be completed, and then decide when that time came to pass (if at all). Questions of pure contractual construction such as this one are matters of law, and as a result, we review them *de novo*. *People ex rel. Department of Public Health v. Wiley*, 218 Ill. 2d 207, 223, 843 N.E.2d 259, 268 (2006); *American States Insurance Co. v. Koloms*, 177 Ill. 2d 473, 479-80, 687 N.E.2d 72, 75 (1997).

Lord & Essex takes the position that Midwest's final product delivery, which Lomacz and Smith both testified was in November or December of 2001, marks the date of completion.

1-06-1233

Under this interpretation, Midwest's claim is untimely, since the complaint was filed over a year later. On the other hand, Midwest contends that work is not yet complete. First, it says that work can only be considered complete once all warranty work has been performed under the contract; thus, the clock would not start running until the shorter of 18 months from product installation or 12 months from the date of closing. There was ample evidence at trial suggesting that Midwest's warranty work has not yet been finished. However, Midwest acknowledges that the latter six contracts contain a clause stating that completion is not tolled by warranty work. We find that this clause is unambiguous and works to foreclose Midwest's warranty argument with respect to those contracts.

Second, Midwest argues that work is not complete until all products have been delivered pursuant to the contract. Furthermore, it contends that Lord & Essex has the burden of proving completion because it is raising the 10-month limitation on suit as an affirmative defense. In that respect, it contends that Lord & Essex failed to present evidence at trial sufficient to show that this is the case. In other words, even if we were to accept *arguendo* that Midwest has not delivered any products since November or December of 2001, Lord & Essex never demonstrated that Midwest delivered all the products that it was contractually required to. Indeed, there was some evidence to the contrary: on direct examination as a hostile witness, Smith said that he believed there were jobs that Midwest had not yet completed, as well as problems with shortages that had not yet been resolved.[4]

---

[4] Later, on direct examination by his own counsel, Smith attempted to explain that he had been referring exclusively to warranty work.

1-06-1233

The contracts themselves make no attempt to affirmatively define "completion," and on its face the term is ambiguous, as shown by the competing interpretations that have been offered by the parties. In determining the correct interpretation, we are mindful of various cases cited by Midwest stating that contractual limitations on suit are disfavored by courts, so where there is any ambiguity, they are to be construed strictly against the drafter. *Michigan Avenue National Bank of Chicago v. Evans, Inc.*, 176 Ill. App. 3d 1047, 1059, 531 N.E.2d 872, 880 (1988); *Custom Line Builders Corp. v. Kansas City Fire & Marine Co.*, 413 F. Supp. 877, 878 (N.D. Ill. 1976). This is consistent with Illinois public policy preferring to decide cases on the merits rather than dismissing them on purely procedural grounds. See *Smith v. City of Chicago*, 299 Ill. App. 3d 1048, 1054, 702 N.E.2d 274, 279 (1998) (stating that "controversies should be determined according to the substantive rights of the parties"). Lord & Essex correctly points out that contractual time limits on bringing suit against a party are not automatically invalid as a matter of law, and when they are clear on their face, they may be strictly enforced. See *Taylor v. Western & Southern Life Insurance Co.*, 966 F.2d 1188, 1203 (7th Cir. 1992). Yet this contention is not inconsistent with Midwest's argument, which concerns interpretation of the provision in the contract that triggers the time at which the limitations period begins to run. Assuming for the sake of argument that the contractual limitation on suit is enforceable as a matter of law, as noted above, we are nonetheless mindful that its scope is to be strictly construed to facilitate a decision on the merits rather than on purely procedural grounds.

Under this standard, we are persuaded that Midwest has the more plausible interpretation of what it means for work to be "completed." Only when a party has entirely fulfilled its

contractual duties does it make sense to say that the party's work under the contract is complete. To state the converse, it is quite possible for a party to cease performance while its contractual duties are still incomplete. Suppose, for instance, that Midwest had only delivered half the cabinets that it was required to under the subcontractor agreements and then abruptly ceased all delivery. It would be absurd to declare that the most recent date of product delivery marked the time of completion.

This interpretation leads us to conclude that Midwest's suit is not time-barred. Due to the conflicting testimony presented at trial on the issue of completion, it would not have been against the manifest weight of the evidence for the court below to have found that the 10-month limitation on suit had not yet been triggered. The trial court did not make such a finding, but we may affirm its decision on any grounds supported by the record. *In re Estate of Funk*, 221 Ill. 2d 30, 96, 849 N.E.2d 366, 403 (2006). In addition, one of Lord & Essex's key defenses on appeal is that Midwest failed to comply with the terms of the subcontractor agreements by failing to submit signed purchase order system documents. This claimed breach of contract, if true, is an impediment to completion just as surely as undelivered cabinets would be. Therefore, regardless of product delivery dates, we find that Lord & Essex is estopped from claiming that Midwest's work under those agreements is "completed."[5]

---

[5] Since we find that Lord & Essex is estopped from claiming that the 10-month period has expired, we need not deal with contentions by Midwest that the 10-month period is unenforceable as a matter of law due to being in contravention of public policy and the Mechanics Lien Act (770 ILCS 60/1 *et seq.* (West 2006)).

Furthermore, we note that even if we were to accept the definition of "completion" given by Lord & Essex, we would still find that the 10-month limitation on suit had not been triggered, due to the missing trial exhibits. We do not know whether there is information in those documents that would have a material impact on the issue of completion; for instance, it is plausible that the communications between Cusimano and Smith could include discussions of incomplete jobs, or that the accounting documents introduced by the parties contain evidence of undelivered goods. Hence, we must construe this gap in the record to favor the trial court's ruling – *i.e.*, that Midwest's suit is not time-barred – even though the trial court did not base its finding on the terms of the subcontractor agreements. See *Tekansky v. Pearson*, 263 Ill. App. 3d 759, 764, 635 N.E.2d 605, 609 (1994) (any doubts raised by missing evidence are to be resolved against the appellant); *In re Estate of Funk*, 221 Ill. 2d 30, 96, 849 N.E.2d 366, 403 (2006) (trial court decision may be affirmed on any grounds).

Lord & Essex's substantive argument is more complex. Pursuant to the purchase order document system, Lord & Essex claims the right to withhold payment unless Midwest has submitted signed purchase orders and contractor's job release notices for the jobs it has completed. In order to properly analyze this claim, we must first consider Midwest's duties under the pure text of the agreements, and then discuss the way in which those duties may have been modified by the course of performance. In ruling upon this argument by Lord & Essex, we are not bound by the reasoning given by the trial court, and we may affirm on any grounds that are justified by the record. *In re Estate of Funk*, 221 Ill. 2d 30, 96, 849 N.E.2d 366, 403 (2006), citing *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 457 N.E.2d 9 (1983).

We begin by examining the text itself. Midwest clearly has a duty to comply with the purchase order document system as described in the contracts. The system is laid out explicitly, and there can be no doubt that it applies to all purchases made by Lord & Essex. The crucial question here is what effect Midwest's alleged noncompliance has on Lord & Essex's obligations.

Lord & Essex is asserting failure of an express condition as a bar to Midwest's recovery. It argues that Lord & Essex has fully performed under the subcontractor agreements, even if it has not paid for all goods that were delivered, because the scope of its obligation to pay is strictly limited by Midwest's compliance with the purchase order system. Even in the first two contracts, the submission of properly signed purchase order system documents is framed as a condition of payment, not merely as a required element of performance; the language is strict and is subject to no other reasonable interpretation. Furthermore, the last six contracts explicitly say that fulfillment of purchase order requirements is an express condition precedent to payment.

When contracts contain express conditions precedent, strict compliance with such conditions is required. *Regency Commercial Associates, LLC v. Lopax, Inc.*, 373 Ill. App. 3d 270, 321, 869 N.E.2d 310, 321 (2007). A condition precedent is defined as a condition in which performance by one party is required before the other party is obligated to perform. *Regency Commercial Associates, LLC v. Lopax, Inc.*, 373 Ill. App. 3d at 282, 869 N.E.2d at 321-22. The purchase order document system fits this description: the language of the subcontractor agreements provides that Lord & Essex has no duty to pay Midwest unless and until signed purchase order documents have been delivered according to the procedures laid out in the contract. Courts will enforce express conditions precedent despite the potential for harsh results

for the noncomplying party: "It is well established that where a contract contains a condition precedent, the contract does not become enforceable or effective until the condition is performed or the contingency occurs." *Dodson v. Nink*, 72 Ill. App. 3d 59, 64, 390 N.E.2d 546, 549 (1979). This is particularly true in the case at hand, which involves transactions between two sophisticated commercial entities. Under the *Dodson* standard, Lord & Essex is correct in its contention that under the text of the subcontractor agreements, it has no duty to pay for any goods where purchase order documents have not been submitted by Midwest. Evidence of actual delivery, such as the invoices and other accounting documents that Midwest presented at trial, is not sufficient to establish liability as long as the condition remains unsatisfied.

However, our analysis of the subcontractor agreements does not end once we have determined the meaning of the contracts at the time they were signed. We must next consider how those obligations may have been modified by the course of performance. Midwest would have us rule that regardless of the obligation to comply with the purchase order document system as spelled out in the text of the subcontractor agreements it signed, that obligation has been modified or eliminated by the course of Lord & Essex's subsequent conduct, on three grounds: (1) by reason of Lord & Essex's acceptance of the goods under the UCC, (2) by reason of its interference with Midwest's performance that renders the condition precedent unenforceable, and (3) by reason of its failure to demand compliance with the purchase order system. On mixed questions of law and fact such as these, the rule is that we defer to the trial court on findings of fact, but undertake independent analysis of the legal issues involved. *Orland Fire Protection District v. Intrastate Piping & Controls, Inc.*, 266 Ill. App. 3d 744, 749, 637 N.E.2d 641, 645

1-06-1233

(1994).

First, Midwest argues that by keeping and later selling the goods that Midwest delivered, Lord & Essex has accepted the goods and is obliged under the Uniform Commercial Code to pay for them regardless of whether Midwest adhered strictly to the terms of the contract.

The UCC provides that once a buyer accepts goods, it is bound to pay the contractually agreed-upon price for them. 810 ILCS 5/2-607(1) (West 2006). Acceptance, by itself, does not affect the buyer's power to later sue for damages caused by breach; however, it does prevent the buyer from later rejecting the goods based on contractual shortcomings that it knew about at the time of acceptance, unless it reasonably believed those shortcomings would be seasonally cured. 810 ILCS 5/2-607(2) (West 2006). Hence, if Lord & Essex is found to have accepted the goods despite knowing that Midwest did not provide the required paperwork, then it is obligated to pay Midwest regardless of Midwest's failure to fulfill the requirements of the purchase order document system to the letter.

A buyer is deemed to have accepted goods when the buyer commits "any act inconsistent with the seller's ownership."[6] 810 ILCS 5/2-606(c) (West 2006). This rule holds true even if the buyer verbally purports to reject the goods in question, as seen in *Fred W. Wolf Co. v. Monarch Refrigerating Co.*, 252 Ill. 491, 96 N.E. 1063 (1911). In that case, defendant purchased a refrigerating plant from plaintiff. After installation, defendant wrote the plaintiff a letter stating

_____

[6] Conversely, when a seller delivers goods to a buyer, and payment is both due and demanded, the buyer does not have the right to keep or dispose of the goods unless he pays the seller. 810 ILCS 5/2-507(2) (West 2006).

that the plant was unsatisfactory and that it refused to accept it; however, defendant continued to use the machinery in its business. The Illinois Supreme Court found that this action constituted waiver of the defendant's right to reject the goods: "Even though the appellant had determined to reject the plant * * * it could not retain possession of the property and use it for its own profit in its business and at the same time insist upon the rejection." *Fred W. Wolf Co. v. Monarch Refrigerating Co.*, 252 Ill. at 502, 96 N.E. at 1066-67. Indeed, even if a purchaser has made a timely rejection of allegedly nonconforming goods, resale of the goods by the purchaser may still be construed as acceptance. *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Group, Inc.*, 218 F. Supp. 2d 974, 978 (N.D. Ill. 2002); *S.A.M. Electronics, Inc. v. Osaraprasop*, 39 F. Supp. 2d 1074, 1085 (N.D. Ill. 1999).

These cases lead us to the conclusion that Lord & Essex has accepted the goods delivered by Midwest. Although Lord & Essex may have planned to reject the goods supplied by Midwest on account of Midwest's failure to provide the paperwork required under the contract, it is undisputed that it kept those goods. Indeed, Smith testified that many of the houses with Midwest's cabinets and appliances in them had already been sold to buyers, which is wholly inconsistent with Midwest's continued ownership. In addition, there is no indication that Lord & Essex expected Midwest to cure the lack of purchase order documents within a seasonable time frame; Midwest could not have delivered the documents without Lord & Essex's cooperation, seeing as a Lord & Essex signature was required. Hence, Lord & Essex's verbal insistence upon compliance with the purchase order document system will not absolve it of liability upon the contract.

1-06-1233

The situation is more complex with respect to six of the eight subcontractor agreements, which unlike the other two, all contain a clause (4.a.ii.3) that reads as follows: "the Contractor shall be deemed to 'accept' Subcontractor's performance as conforming *only if* the Construction Manager shall make an appropriate notation, under a dated signature, on the related Purchase Order System Document(s)" (emphasis in original). This definition of "acceptance" is binding upon Midwest, for the UCC definition only applies in the absence of an explicit agreement between the parties to the contract: "The effect of provisions of this Act may be varied by agreement, except as otherwise provided in this Act." 810 ILCS 5/1-102(3) (West 2006).

If read with rigid literalism, the wording of the contractual definition might seem to indicate that Lord & Essex has not accepted the goods and hence does not have to deal with any of the consequences of acceptance. This would certainly be Lord & Essex's preferred reading. However, a more reasonable interpretation of the acceptance clause is as follows: If Midwest does not obtain signatures on its purchase order system documents, Lord & Essex does not have to accept any goods delivered and may thus return them without having to pay. There is nothing in the subcontractor agreements about Lord & Essex being entitled to retain and dispose of goods that are delivered pursuant to the contract, without having to pay for them. Smith's undisputed testimony at trial established that Lord & Essex has already sold many of the houses with Midwest's goods in them, and that when it did so, title to the goods passed to the homeowners. Simply conditioning acceptance of the goods upon delivery of the proper paperwork does not automatically mean that Lord & Essex may exercise this sort of dominion over the goods as if they were gifts made by Midwest. This is not a reasonable assumption in a commercial context.

-37-

To be sure, parties to a contract could certainly bargain for such harsh terms, particularly commercially sophisticated parties like the ones in the case at hand. But without more explicit language to that effect, we are not willing to read such terms into the agreement.

We therefore conclude that the contractual definition of "acceptance" does not encompass situations such as this one, involving such complete exercise of dominion over the goods. That is, while the definition remains binding upon the parties, it is not applicable in the current context. Rather, the UCC definition of "acceptance" is what controls, and under that definition, Lord & Essex has accepted the goods. As a result, even under the final six subcontractor agreements, Midwest is entitled to be paid according to the terms of the contract.

Second, Midwest argues by implication that Lord & Essex materially interfered with Midwest's attempts to comply with the purchase order system, thus excusing Midwest's noncompliance with the system as an express condition precedent to payment.[7]

To ameliorate the strict enforcement of conditions precedent, courts have developed the following doctrine: "Where the performance of the contingency or condition is within the control of a party to the agreement, the party for whose benefit the condition precedent runs is required to use 'reasonable efforts' to have it occur." *Dodson v. Nink*, 72 Ill. App. 3d 59, 64, 390 N.E.2d 546, 549 (1979); *Smith v. Vernon*, 6 Ill. App. 3d 434, 437-38, 286 N.E.2d 99, 102 (1972). For

---

[7] Although Midwest does not state this argument explicitly, it repeatedly alludes to the actions that Lord & Essex allegedly took to impede Midwest's performance, both in its trial arguments and in its briefs on appeal. Furthermore, the trial court took these actions by Lord & Essex into account when rendering its decision.

instance, in *Smith*, 6 Ill. App. 3d 434, 286 N.E.2d 99, plaintiffs contracted to purchase real estate from defendants. The deal was contingent upon plaintiffs being able to secure a first mortgage. Plaintiffs subsequently received a reasonable mortgage offer from a bank, but they turned it down and did not secure any other offers. The court found that they failed to take "reasonable efforts" to fulfill the condition and accordingly entered judgment in favor of defendants. *Smith*, 6 Ill. App. 3d at 438, N.E.2d at 102.

This principle may be seen as an extension of the implied covenant of good faith and fair dealing contained in every contract. 810 ILCS 5/1-203 (West 2006); *Resolution Trust Corp. v. Holtzman*, 248 Ill. App. 3d 105, 112, 618 N.E.2d 418, 424 (1993). This covenant prohibits the parties from exercising their contractual discretion "arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Resolution Trust*, 248 Ill. App. 3d at 112, 618 N.E.2d at 424. When a contract is contingent upon satisfaction of a condition, and the other party has discretionary power over that condition, it is in most circumstances quite reasonable to expect that party to take affirmative steps to see that the condition is satisfied.

In light of this principle, it is highly problematic that Lord & Essex took actions that made it difficult or nearly impossible for Midwest to conform to the terms of the subcontractor agreements. The purpose of the purchase order document system was certainly to benefit Lord & Essex, as Popp testified that it was necessary to prevent subcontractor fraud. "Reasonable efforts" to ensure compliance with the system would require Lord & Essex to facilitate Midwest's attempts to get its purchase order documents signed as required under the contracts. Furthermore, a reasonable subcontractor in Midwest's position would have expected that

1-06-1233

Midwest employees who came to deliver goods would be able to obtain signatures on their purchase order system documents if the goods conformed to contract specifications. In other words, it was an implicit part of the system that Midwest would be able to obtain signed paperwork upon tender of satisfactory goods.

Unfortunately, this was not always the case. In fact, there is strong evidence to suggest that Lord & Essex took actions that seem designed to impede Midwest's ability to procure signed purchase order documents. The trial court found that Lord & Essex frequently did not have an on-site representative who could sign purchase orders when Midwest's employees arrived at jobsites, because Smith fired the person in charge of signing the orders. We defer to this factual finding, considering that it was supported by testimonial evidence: Lee Ann Lomacz stated that when she delivered goods for Midwest, there was often no Lord & Essex representative available to sign her purchase orders; Midwest president Lomacz also spoke of difficulty in getting purchase order documents signed; and Smith himself admitted that he fired a field supervisor whose job it was to sign Midwest's paperwork. Thus we see that Lord & Essex, like the plaintiffs in *Smith*, 6 Ill. App. 3d at 437-38, 286 N.E.2d at 102, actively took steps to prevent the fulfillment of a condition precedent to payment. We therefore find that Lord & Essex has given up its ability to enforce the provision as a condition precedent. Midwest's failure to produce signed purchase orders and contractor's job release notices cannot function as a bar to Midwest's recovery when Lord & Essex effectively made it impossible for Midwest to produce such documents for each and every delivery that it made to the jobsites.

Finally, Midwest contends that Lord & Essex cannot assert the purchase order

-40-

requirement as a bar to Midwest's recovery because, in practice, Lord & Essex did not actually require all the signed paperwork from Midwest as a condition precedent to payment. There are two ways that such conduct could potentially affect the terms of the contracts: First, it could be used as a tool for interpreting the original terms, and second, it could operate as a means of waiver. We consider these possibilities in turn.

Under the UCC, conduct during the course of performance can aid in interpretation of a written contract by shedding light on the understanding between the parties. Section 2-208(1) of the UCC provides: "Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement." 810 ILCS 5/2-208(1) (West 2006). However, if the express terms of the contract and the course of performance cannot be reconciled, express terms will trump course of performance. 810 ILCS 5/2-208(2) (West 2006). That is, "a course of dealing between the parties is admissible 'to explain, supplement, or add to the agreement (but not contradict it).' " *Scott v. Assurance Co. of America*, 253 Ill. App. 3d 813, 818, 625 N.E.2d 439, 443 (1993), quoting J. White & R. Summers, Uniform Commercial Code §2-10, at 85 (2d ed. 1980). Hence, even if the course of performance between the parties indicated that purchase orders were not always necessary for payment (a disputed fact, as shall be discussed below), as a matter of pure interpretation, that would not affect the clear and unambiguous meaning of the purchase order requirement contained in the subcontractor agreements.

The analysis does not end there, because under the UCC, the course of performance is more than an interpretive tool; it may also give rise to waiver of express contractual terms if those terms are not strictly adhered to. Waiver is defined as the intentional relinquishment of a known right. *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d 224, 232, 601 N.E.2d 956, 961 (1992). In contract law, if a party indicates by its conduct that compliance with a particular provision is not required, then waiver of that provision may be implied. *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d at 232, 601 N.E.2d at 961; *Custom Line Builders Corp., Inc. v. Kansas City Fire & Marine Co.*, 413 F.Supp. 877, 878 (N.D. Ill. 1976). However, courts will not imply waiver from conduct unless there has been reliance by the other side or waiver is "clearly inferable from the circumstances." *Central Illinois Public Service Co. v. Atlas Minerals, Inc.*, 965 F. Supp. 1162, 1173 (C.D. Ill. 1997).

Under Section 2-208(3) (810 ILCS 5/2-208(3) (West 2006)), waiver demonstrated through the course of performance can be effective to change the express terms of a contract. *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d at 232, 601 N.E.2d at 961. This holds true even for contracts that are fully integrated. 810 ILCS 5/2-202(a) (2006). The policy behind this broad doctrine of waiver in contract law is to "prevent the waiving party from 'lull[ing] another into a false assurance that strict compliance with a contractual duty will not be required and then sue for noncompliance.' " *Wagner Excello Foods, Inc. v. Fearn International, Inc.*, 235 Ill. App. 3d at 233, 601 N.E.2d at 962, quoting *Whalen v. K Mart Corp.*, 166 Ill. App. 3d 339, 343, 519 N.E.2d 991 (1988).

At this juncture, we note that the missing trial exhibits might be highly relevant to the

issue of whether Lord & Essex waived the terms of the purchase order document system. For instance, it is possible that instances of waiver are referred to in the correspondence between Cusimano and Smith, or between Lomacz and Popp. Furthermore, it is also possible that the parties' accounting records reveal situations where Lord & Essex paid Midwest despite not having all the paperwork that it now claims is essential to payment. As stated above, we must construe this gap in the record against the appellant, which in this case means that we must assume evidence of waiver is contained within the now-discarded exhibits.

We further note that even if we were not to make our ruling on the presumptions that emanate from Lord & Essex's failure to provide the trial exhibits, there may well be sufficient evidence in the record to independently support Midwest's contention that Lord & Essex did not strictly enforce the paperwork requirement, and that Smith induced them to believe that it would not be strictly enforced in future. Its claim is corroborated by testimony from Smith indicating that contract procedures were not always followed with respect to payment. In particular, Smith admitted that he generally did not require signed purchase orders as long as Midwest could present signed contractor's job release forms. Furthermore, there is evidence to suggest that a signature from a Lord & Essex representative was not always required by Lord & Essex even for contractor's job release notices, as Lomacz testified that Smith authorized Midwest employee Cusimano to sign for him.[8] While Midwest does not explicitly say that this behavior caused detrimental reliance on its part, a reasonable fact finder could infer it from the above-cited testimony and the fact that Midwest was induced to make its deliveries without in each instance

---

[8] Smith consistently denied this in his testimony.

obtaining a Lord & Essex signature on the purchase order and contractor's job release notice as required by the terms of the contracts. Thus, although the trial court made no explicit finding on the issue of waiver due to the fact that it premised liability on the credit information sheet, it could have found that waiver was "clearly inferable from the circumstances" under the standard articulated in *Central Illinois Public Service Co.*, discussed above. See generally *In re Estate of Funk*, 221 Ill. 2d 30, 96, 849 N.E.2d 366, 403 (2006) (trial court decision may be affirmed on any grounds).

In any event, as previously discussed, Lord & Essex's acceptance and subsequent sale of the goods, as well as its actions taken to impede compliance with the purchase order document system, are sufficient to support our finding that the purchase order document system presents no barrier to Midwest's recovery under the subcontractor agreements.

E. Conclusion

Thus, for the foregoing reasons, the judgment of the trial court is affirmed.

Midwest also requests that we remand the case for calculation of additional court costs and attorney fees incurred in pursuing this appeal, as well as additional interest that has accrued on Lord & Essex's debt. Because we have held that the remedies of court costs, attorney fees, and interest provided in the credit information sheet are not superseded by the terms of the subcontractor agreements, and because the reimbursement of costs and attorney fees is not limited in the credit information sheet to those incurred only at the trial proceeding, in that the credit information sheet speaks more expansively of pursuing collection of payment "by suit," we grant this request.

Affirmed and remanded for further proceedings.

McBRIDE, P.J., and O'MALLEY, J., concur.